[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 15, 2005
THOMAS K. KAHN
CLERK

_____

No. 05-11880

_____

D. C. Docket No. 05-00674-CV-CC-1

BELLSOUTH TELECOMMUNICATIONS, INC.,

Plaintiff-Counter-Defendant-Appellee,

versus

MCIMETRO ACCESS TRANSMISSION SERVICES, LLC,
a Delaware Limited Liability Company,

Defendant-Counter-Claimant-Appellant,

NUVOX COMMUNICATIONS, INC.,
a Delaware Corporation,
KMC TELECOM HOLDINGS, INC.,
a Delaware Corporation,
KMC TELECOM V, INC.,
a Delaware Corporation,
KMC TELECOM III, LLC,
a Delaware limited liability company,
XSPEDIUS MANAGEMENT CO. SWITCHED SERVICES, LLC,
AT&T COMMUNICATIONS OF THE SOUTHERN STATES, LLC,
XSPEDIUS MANAGEMENT CO. OF ATLANTA,
TALK AMERICA, INC.,

a Pennsylvania Corporation,
LECSTAR TELECOM, INC.,
a Georgia Corporation,
ITC^DELTACOM COMMUNICATIONS, INC.,
an Alabama Corporation d.b.a. ITC^DeltaCom,
BUSINESS TELECOM, INC.,
a North Carolina Corporation,
BROADRIVER COMMUNICATIONS CORP.,
a Delaware Limited Liability Company,
CBEYOND COMMUNICATIONS, LLC,
a Delaware Limited Liability Company,
CONSUMERS' UTILITY COUNSEL DIVISION OF THE
GOVERNOR'S OFFICE OF CONSUMER AFFAIRS,
DIECA COMMUNICATIONS, INC.,
d.b.a. Covad Communications Corporation,
SOUTHERN DIGITAL NETWORK, INC.,
d.b.a. FDN Communications,
USCARRIER TELECOM,
a Georgia Limited Liability Co.,
US LEC OF GEORGIA, INC.,
GEORGIA PUBLIC SERVICE COMMISSION,

Defendants-Appellants,

XO COMMUNICATIONS SERVICES, INC., et al.,

Defendants.

————————————

Appeals from the United States District Court
for the Northern District of Georgia

————————————

**(September 15, 2005)**

Before TJOFLAT, PRYOR and ALARCÓN[*], Circuit Judges.

PRYOR, Circuit Judge:

The key issue in this appeal is whether the district court abused its discretion when it entered a preliminary injunction that barred enforcement of an order of the Georgia Public Service Commission, which had required BellSouth Telecommunications, Inc., to negotiate the terms of providing its competitors unlimited access to its facilities. Because the Federal Communications Commission, in a regulatory order, had ruled that unlimited access was no longer permitted, the district court did not abuse its discretion when it determined that BellSouth showed a substantial likelihood of success on the merits and both the balance of harms and the public interest supported the entry of a preliminary injunction.

## I. BACKGROUND

In the Telecommunications Act of 1996, Congress sought to enhance competition in the local telephone service market to promote better quality and lower prices. Pub. L. No. 104-104, 110 Stat. 56. Congress delegated to the FCC the task of implementing this scheme of enforced competition. The FCC

---

[*] Honorable Arthur L. Alarcón, United States Circuit Judge for the United States Court of Appeals for the Ninth Circuit, sitting by designation.

responded by requiring "Incumbent Local Exchange Carriers" (ILECs) to offer "Competitive Local Exchange Carriers" (CLECs) "unbundled" access to various components of the local telephone network known collectively as "unbundled network elements" (UNEs). In practical terms, unbundled access meant that ILECs provided CLECs access to UNEs at greatly reduced rates.

UNE components include "loops," "switches," and "transport facilities." Loops are copper wires that connect a home or business to the local phone company switch. A switch is a device, usually software, that routes a call from a home or office to the intended recipient. Transport facilities are devices such as copper wires or fiberoptic cables that transport calls between switches.

For eight years, the FCC tried and failed to implement a regulatory scheme that, after review by federal courts, satisfied the 1996 Act. For most of those eight years, the FCC required unbundling on the theory that it enhanced competition. The FCC required ILECs and CLECs to enter "voluntary" agreements to provide unbundled access to local telephone networks. If the parties could not agree, an agreement was provided either by the FCC or by state commerce commissions. States were given the authority to oversee voluntary agreements and arbitrate disputes arising from those agreements. 47 U.S.C. § 252(a), (b).

Under this regulatory scheme, BellSouth entered many agreements with

CLECs. BellSouth agreed to provide network access at specified rates. Included in those agreements was a standard "change of law" provision, which required the parties, upon any change of law that materially altered the agreement, to "renegotiate in good faith such mutually acceptable new terms as may be required."

In 2004, in a challenge to the FCC scheme filed by ILECs, the D.C. Circuit vacated the second attempt of the FCC to implement the directive of Congress regarding local phone service. See U.S. Telecom Ass'n v. F.C.C., 359 F.3d 554 (D.C. Cir. 2004). The D.C. Circuit concluded, in part, that the unbundling regime enacted by the FCC was not based on a rational analysis of whether "CLECs are impaired in the mass market without unbundled access to ILEC switches." Id. at 569. The D.C. Circuit also expressed some frustration regarding the "failure [of the FCC], after eight years, to develop lawful unbundling rules, and its apparent unwillingness to adhere to prior judicial rulings." Id. at 595. In response to the ruling of the D.C. Circuit, the FCC issued interim rules that preserved the status quo ante while the FCC wrote new rules, and the FCC established a transition period, ending in early 2005, in which only existing customers could be served through UNEs.

In February 2005, the FCC released its Triennial Review Remand Order

5

(TRRO), which stated that the unbundling of certain "UNE-Platform" (UNE-P) elements harmed competition by discouraging innovation. To redress that harm, the FCC stated that ILECs would no longer be obliged to provide CLECs "with unbundled access to mass market local switching," and the FCC provided more limited relief from unbundling for loops and transport. The FCC stated that existing, or "embedded," customers could continue to have access to UNE-Ps for up to twelve months, although at higher rates. The FCC also required CLECs to submit orders within one year to convert embedded UNE-P customers to "alternative arrangements." During the transition period, the FCC banned new orders for unbundled access to local mass market switching: "This transition period shall apply only to the embedded customer base, and does not permit competitive LECs to add new customers using unbundled access to local circuit switching." The FCC required both ILECs and CLECs to negotiate, under the change-of-law provisions in their contracts, any "necessary" changes to the interconnection agreements: "We expect that [carriers] will implement [our] findings. . . . Thus, carriers must implement changes to their interconnection agreements consistent with our conclusions in this Order. . . . Thus, [carriers] must negotiate in good faith regarding any rates, terms, and conditions necessary to implement our rule changes." Based on the "need for prompt action," the FCC

6

stated that the TRRO was effective on March 11, 2005.

On February 11, 2005, BellSouth informed various CLECs that, as of the effective date of the TRRO, BellSouth would not accept new orders for unbundled local switching or UNE-P, nor would it accept loop and transport orders no longer required under the TRRO. In response to that decision by BellSouth, MCImetro Access Transmission Services, LLC, a CLEC, filed an emergency motion with the Georgia Public Service Commission and argued that BellSouth was required to continue serving the embedded base and accept new UNE-P orders so long as the change-of-law negotiating process was ongoing. Other CLECs then filed similar motions with the Commission.

The Commission granted the motions. The Commission ruled that the FCC, in paragraph 233 of the TRRO, required carriers to implement through negotiations all changes mandated by the TRRO. Although the Commission stated that the FCC had the power, under the "proper circumstances," to alter carriers' rights under interconnection agreements, the Commission concluded that the FCC had not intended to abrogate the usual change-in-law process between carriers. The Commission, therefore, required BellSouth to negotiate with MCImetro and other CLECs regarding an amendment to their interconnection agreements.

BellSouth sued the CLECs and the Commission in federal court and moved for a preliminary injunction. The district court granted the injunction and held that BellSouth had established a substantial likelihood of success on the merits. The district court concluded that, because the TRRO was immediately effective, there was nothing to negotiate regarding the determination of the FCC that unbundling was no longer permitted for local switching and, in limited circumstances, for loops and transport facilities. The district court reasoned that to allow CLECs to add new UNE-P customers would be inconsistent with the plain language of the TRRO.

The district court also found that BellSouth was suffering irreparable harm due to the loss of customers and those customers' goodwill, and the harm to BellSouth outweighed the harm to CLECs. The district court found that the CLECs would suffer harm "only if they intended to compete by engaging in conduct that the FCC has concluded is anticompetitive and contrary to federal policy." The district court determined that a preliminary injunction was in the interest of the public, because the FCC "authoritatively determined" that the practice of unbundling under the old regime harmed competition and was contrary to the public interest. This Court granted the CLECs an expedited appeal, but denied their motion to stay the injunction pending appeal.

## II. STANDARD OF REVIEW

This Court reviews for abuse of discretion the grant of a preliminary injunction. Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc., 304 F.3d 1167, 1171 (11th Cir. 2002). "We begin our review by noting how deferential it is." Id. "Appellate review of such a decision is very narrow. The district court's decision will not be reversed unless there is a clear abuse of discretion." Revette v. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, 740 F.2d 892, 893 (11th Cir. 1984) (per curiam). "The expedited nature of preliminary injunction proceedings often creates not only limits on the evidence available but also pressure to make difficult judgments without the luxury of abundant time for reflection. Those judgments, about the viability of a plaintiff's claims and the balancing of equities and the public interest, are the district court's to make and we will not set them aside unless the district court has abused its discretion in making them." Cumulus, 304 F.3d at 1171.

## III. DISCUSSION

The CLECs and the Commission advance three arguments that we address in turn. First, the CLECs and the Commission argue that the district court misread the TRRO when it held that BellSouth had established a high likelihood of success. Second, the CLECs and the Commission contend that the district court

9

abused its discretion when it held that the equities and the public interest favored BellSouth. Third, the CLECs request that the injunction be vacated, because the district court failed to set a bond amount to protect their interests under Federal Rule of Civil Procedure 65(c). None of these arguments is persuasive.

*A. The Preliminary Injunction Was Not
An Abuse of Discretion.*

A district court may issue a preliminary injunction when the moving party demonstrates (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction is issued; (3) the threatened injury to the moving party outweighs whatever damage the proposed injunction might cause the non-moving party; and (4) if issued, the injunction would not be adverse to the public interest. <u>Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.</u>, 320 F.3d 1205, 1210 (11th Cir. 2003). It is clear that the district court considered each of these factors. Our review of that decision reveals no abuse of discretion.

1. BellSouth Will Likely Succeed on the Merits.

In the TRRO, the FCC reversed its position of nearly a decade that widespread unbundling was needed to implement the will of Congress. This policy reversal was prompted by the scathing rebuke from the D.C. Circuit in <u>U.S.</u>

10

Telecom Association v. FCC. The heart of this controversy between BellSouth and the CLECs concerns the intent of the FCC in fashioning its new policy in the TRRO.

The FCC now contends that a "nationwide bar" on UNE-P orders will encourage innovation and will not impair CLECs. To effect this policy choice, and given the need for "prompt action," the FCC decreed that new UNE-P orders, among others, would not be permitted. Under the transition plan, the FCC, obviously aware that the changes it ordered could not be carried out immediately without massive disruptions in service, allowed for current CLEC customers to have access to UNE-Ps for up to twelve months. After the transition period, even current CLEC customers must have alternative arrangements.

Despite this clear directive, the CLECs and the Commission contend that BellSouth must negotiate with the CLECs regarding this aspect of the TRRO. It is not clear, under their reasoning, what remains to be negotiated. After all, the TRRO "does not permit" new customers access to UNE-Ps after March 11, 2005, and BellSouth does not dispute that it still must offer access in some circumstances to loops and transport facilities.

The CLECs and the Commission argue that paragraph 233 of the TRRO requires carriers to implement, through negotiation, all changes mandated by the

11

TRRO, but this argument fails. The plain language of paragraph 233 requires negotiations over only those items necessary to effect the changes mandated by the TRRO: "[C]arriers must implement changes to their interconnection agreements consistent with our conclusions in this Order. . . . Thus, [carriers] must negotiate in good faith regarding any rates, terms, and conditions necessary to implement our rule changes." As BellSouth correctly argues, the TRRO is a massive document that addresses many issues besides unbundling, and those ancillary issues require the parties to cooperate. In contrast, the TRRO leaves nothing to be done regarding UNE-P orders for new customers, because they are no longer allowed. No negotiations are necessary to implement this aspect of the TRRO.

The parties dispute whether the Mobile-Sierra doctrine allows the FCC to change unilaterally the terms of the interconnection agreements. Under this doctrine, an agency can abrogate or modify a utility contract "only if the public interest so requires." Transmission Access Policy Study Group v. FERC, 225 F.3d 667, 709 (D.C. Cir. 2000) (per curiam); see also Fed. Power Comm'n v. Sierra Pac. Power Co., 350 U.S. 348, 353-55, 76 S. Ct. 368, 371-72 (1956); United Gas Pipe Line Co. v. Mobile Gas Serv. Corp., 350 U.S. 332, 344-45, 76 S. Ct. 373, 380-81 (1956). The CLECs and the Commission argue that the FCC could not have invoked the Mobile-Sierra doctrine, because the FCC did not make an

12

explicit finding regarding the public interest, but this argument fails.

The FCC plainly based its decisions on the public interest. In paragraph 218 of the TRRO, the FCC found that continued use of the UNE-P was contrary to the public interest, because it "hinder[ed] . . . genuine, facilities-based competition." Paragraph 236 made the TRRO effective on March 11 also to serve the public interest.

The FCC has the undisputed power to issue binding rules under the 1996 Act. See AT&T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 380, 119 S. Ct. 721, 730 (1999). An agency also has the power to correct its earlier legal errors, Gun South, Inc. v. Brady, 877 F.2d 858, 862 (11th Cir. 1989), and the interconnection agreements were the product of an earlier regulatory scheme now repudiated by the FCC. The FCC had the power to impose unilaterally the ban on new unbundling, and it makes no sense to argue that BellSouth is required to negotiate over a practice the FCC has the power to and did prohibit.

In summary, the CLECs are clinging to the former regulatory regime in an attempt to cram in as many new customers as possible before they are forced to bow to the inevitable, but their argument contravenes the clear intent of the TRRO. Their remaining arguments as to why their interpretation of the TRRO is correct are not properly before this Court. An order of an agency can only be

13

defended on the grounds cited by the agency during the administrative proceeding. Fla. Dep't of Labor & Employment Sec. v. United States Dep't of Labor, 893 F.2d 1319, 1321-22 (11th Cir. 1990). The district court did not abuse its discretion in determining that BellSouth had established a substantial likelihood of success.

## 2. BellSouth Faced Irreparable Injury, the Balance of Harms Favored BellSouth, and the Injunction Was In the Interest of the Public.

The record also shows that the district court did not abuse its discretion when it determined that BellSouth established both irreparable harm and that the balance of harms was in its favor. BellSouth faced the loss of customers due to the order of the Commission. Although economic losses alone do not justify a preliminary injunction, "the loss of customers and goodwill is an irreparable injury." Ferrero v. Associated Materials Inc., 923 F.2d 1441, 1449 (11th Cir. 1991) (internal quotation marks omitted). The record supports the finding of the district court that BellSouth was losing about 3200 customers per week under the previous regime.

The alleged injuries of the CLECs do not outweigh those of BellSouth. Although the CLECs undoubtedly will lose customers, they will, as the district court reasoned, suffer that harm only as a result of "conduct that the FCC has concluded is anticompetitive and contrary to federal policy." The district court did

not abuse its discretion when it found that the balance of these harms favored BellSouth.

For similar reasons, the injunction was in the public interest. As the FCC found, the earlier unbundling rules "frustrate[d] sustainable, facilities-based competition," and a delay in implementing the new rules would be "contrary to the public interest." Based on these findings, the district court did not abuse its discretion when it found that compliance with the TRRO, not the contrary order of the Commision, was in the public interest.

*B. The District Court Did Not Abuse Its Discretion When It Directed Counsel To Confer Regarding the Amount of Security Under Rule 65(c).*

The CLECs finally contend that, because the district court failed to set a bond upon the issuance of the preliminary injunction, the injunction should be vacated. Federal Rule of Civil Procedure 65(c) requires that an applicant for a preliminary injunction provide security against the potential effects of a wrongly-issued injunction:

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained. . . .

Fed. R. Civ. P. 65(c). This Court has stated previously, in dicta, that "before a

15

court may issue a preliminary injunction, a bond must be posted," Piambino v. Bailey, 757 F.2d 1112, 1143 (11th Cir. 1985), but it is well-established that "the amount of security required by the rule is a matter within the discretion of the trial court . . . [, and] the court may elect to require no security at all." City of Atlanta v. Metro. Atlanta Rapid Transit Auth., 636 F.2d 1084, 1094 (5th Cir. Unit B 1981) (citation and quotation marks omitted).

Although the district court did not set a security amount, it stated that the parties were to confer regarding the "bond issue." That statement shows both the district court was aware of the bond requirement and there was some discussion of the issue at the hearing on the motion for a preliminary injunction. The district court did not abuse its discretion when it declined to set a bond amount at that time. Cf. City of Atlanta, 636 F.2d at 1094.

## IV. CONCLUSION

The district court was "well within the bounds of its discretion" in entering a preliminary injunction to effectuate the TRRO, "and we will not second guess its judgment." Cumulus, 304 F.3d at 1179.

**AFFIRMED.**

16