**FEDERAL TRADE COMMISSION,**
Plaintiff,

v.

**STERLING PRECIOUS METALS, LLC, a Florida Limited Liability Corporation, Kerry Marshall, Matthew Meyer, and Francis Ryan Zofay, Defendants.**

**Case No. 12–80597–CIV.**

United States District Court,
S.D. Florida.

Sept. 11, 2012.

Dama J. Brown, Gideon E. Sinasohn, Federal Trade Commission, Atlanta, GA, for Plaintiff.

Howard Seth Goldfarb, Peter W. Homer, Homer Bonner, P.A., Miami, FL, Jeffrey M. Glotzer, Jeffrey M. Glotzer, P.A., Coral Springs, FL, for Defendants.

## ORDER DENYING TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

KENNETH A. MARRA, District Judge.

THIS CAUSE is before the Court upon Plaintiff Federal Trade Commission's ("FTC") Motion for Temporary Restraining Order with Asset Freeze, Appointment of a Receiver, and Order to Show Cause Why Preliminary Injunction Should Not Issue (DE 3), filed on June 4, 2012. On June 8, 2012, the FTC filed a notice of stipulated preliminary injunction order against Defendant Kerry Marshall. DE 21. The Court held a hearing with regard to enjoining the remaining Defendants on June 11, 2012, and the parties have subsequently filed their written closing arguments with the Court (DEs 31, 32) and Responses (DEs 36, 37). The Court has carefully considered the motion, briefs, and evidence and is otherwise fully advised in the premises.

## I. Introduction

### A. The Complaint

This matter is an action brought by the FTC against Defendant Sterling Precious Metals, LLC ("Sterling") and three individuals associated with the company: Kerry Marshall, Matthew Meyer, and Francis Ryan Zofay. Complaint at ¶¶ 6–9. The Complaint alleges that "Defendants collectively operate an investment scheme in which telemarketers promise consumers, some of whom are senior citizens and retirees, that consumers can earn large profits quickly and safely with precious metals." Id. at ¶ 11. "After leading consumers to believe that the offered precious metals investments are lucrative and safe, Defendants fail to clearly disclose the total costs of the investments." Id. at ¶ 15. Specifically, the Complaint provides:

Defendants often fail to clearly inform consumers that their precious metals investments are sold as a leveraged or financed transaction, meaning that a consumer's investment is used to pay for about 20% of the precious metals purchased, with the remaining 80% being financed to the consumer through a loan with interest. Thus, some consumers are unaware that the money that they agreed to invest with Defendants will only pay a fraction of the total cost of the precious metals purchased. Even when Defendants mention to consumers that the precious metals transactions are

leveraged, they misstate or do not clearly explain the terms, conditions, and costs of the leveraged transaction, such as the fact that consumers must pay interest charges on the leveraged portion of the transaction.

*Id.* at ¶ 16. Finally, the Complaint alleges that Defendants misrepresented fees and commissions that consumers were required to pay, *id.* at ¶ 17, or that consumers were "likely to receive equity calls on their accounts, which will require consumers to invest additional money to keep their precious metals from being liquidated." *Id.* at ¶ 18.

The Complaint alleged two violations of the section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45, 53(b) and 57b: misrepresentation (Count I) and failing to adequately disclose material information (Count II). The Complaint also set forth three violations of the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101–6108: misrepresenting an investment opportunity (Count III), failing to clearly and conspicuously disclose total costs (Count IV), and failing to clearly and conspicuously disclose material conditions (Count V).

### B. Motion for Temporary Restraining Order

On June 4, 2012, concurrent with the Complaint, Plaintiff filed its Motion for Temporary Restraining Order with Asset Freeze, Appointment of a Receiver, and Order to Show Cause Why Preliminary Injunction Should Not Issue ("TRO Motion"). DE 3. After setting forth the same allegations made in the Complaint, *id.* at 5–9, the TRO Motion provided two separate bases for the Court to grant a preliminary injunction. First, the FTC relied on 15 U.S.C. § 53(b), which provides that "Upon a proper showing that, weighing the equities and considering the [FTC]'s likelihood of ultimate success, such action would

be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond ..." *Id.* at 11–12. The FTC also cited 15 U.S.C. § 57b, which provides that the Court "shall have jurisdiction to grant such relief as the court finds necessary to redress injury to consumers or other persons, partnerships, and corporations resulting from the rule violation or the unfair or deceptive act or practice, as the case may be." *Id.* at 12.

After providing a basis for the Court to grant a preliminary injunction, the FTC asserted that immediate injunctive relief is necessary to prevent further harm. *Id.* at 13–15. In support of this proposition, the FTC provided:

Defendants have repeatedly violated the FTC Act and the [Telemarketing Act] by falsely representing that consumers who purchase their precious metals will quickly earn substantial profits with low or minimal risk. Defendants also fail to clearly and conspicuously disclose the total fees, commissions, interest charges, and leverage balances that consumers are required to pay to purchase and receive precious metals, which render the investments largely unprofitable. In addition Defendants fail to clearly and conspicuously disclose that consumers are likely to receive equity calls that will require consumers to pay additional money or to liquidate their precious metals, which make the investments risky. Defendants' false representations and omissions are material and mislead consumers who rely on the claims made by Defendants. Consumers consistently report that Defendants' representations regarding the profitability, risks, costs, and other central characteristics of the precious metals investment offer were material to their decision to buy, and that they were mislead by Defendants.

*Id.* at 13–14 (internal citations omitted). In support of these claims, the FTC relied on the affidavits of ten current or former customers of Sterling.

## C. *Evidentiary Hearing*

Immediately after the FTC filed its initial Complaint (DE 1) and TRO Motion (DE 3), the Court scheduled a hearing for June 11, 2012. DE 8. At the hearing, the FTC presented two witnesses that were customers of Sterling: Douglas Redding and Gerald Soethe. Defendants presented only the testimony of Defendant Ryan Zofay.

### 1. *FTC Witness Douglass Redding*

Mr. Redding testified that he was first contacted by a Sterling representative in August 2011. Transcript of June 11, 2012, Hearing, DE 23 ("Tran.") at 21. Mr. Redding made the following relevant statements on direct examination:

- I asked [the Sterling representative] what the risk was going to be on it, and he said there's always a risk, I can't tell you there's not a risk, but the way the market's going, I don't see you're going to have to worry about that. Tran. at 22.

- [T]he word "leverage" didn't come up. He said the beauty of this is you can get two and a half times more of the product than you pay for through precious metals. It's a 2.5 conversion. And I go, what does that mean? Well, for every amount you put in, you get 2.5 more, and that you get way more—you get way more product to work with, so you'll make your money that much faster ... I understand that I had more product to make me—to make more money. I mean, if I got more in there, I'm going to make more money. I said, well, yeah, I could lose more, too. Tran. at 22–23.

Mr. Redding also testified that, at the time he made his initial investment, Sterling's commission was a "fifteen percent commission fee up front on the money I invested." Tran. at 24. Mr. Redding further testified that shortly after receiving his first statement, revealing that he was actually charged fifteen percent on the total leveraged amount, he called Sterling to challenge the fee. Tran. at 24–25. During that call, Mr. Redding stated that one of Sterling's representatives explained the fee in greater detail.

On cross-examination, Mr. Redding admitted that prior to his relationship with Sterling he understood that silver and gold are considered speculative investments. Tran. at 59–60. Mr. Redding further acknowledged that he not only received a packet of documents from Sterling prior to opening an account, but that he actually read those documents before sending any money in. Tran. at 62–63.

### 2. *FTC Witness Gerald Soethe*

Mr. Soethe testified that he had received a cold call from Ryan Zofay in September 2010 with regard to investing in heating oil with a company called Oxford Trading Group. Tran. at 104–05. He claimed that Mr. Zofay never discussed any possible risk with investing, but despite that Mr. Soethe nonetheless invested three thousand dollars with Oxford roughly two weeks after Mr. Zofay initially reached out to him. Tran. at 105–06. Sometime thereafter, Mr. Zofay contacted Mr. Soethe and asked him if he was interested in investing in precious metals. Tran. at 106. Mr. Soethe claimed that Mr. Zofay never disclosed information about the fees associated with such purchases, leveraging the purchases, or taking out a loan to purchase those metals. Tran. at 106. Mr. Soethe eventually sent in twenty-five thousand dollars to purchase silver from Sterling, but claimed that he never received

any documentation disclosing the risks or fees associated with the purchase. Tran. at 109–10. He claimed that he agreed to purchase approximately 2,810 ounces of silver over the phone, and that neither during the call with Mr. Zofay or a subsequent call from a complaint department was he informed that he was actually purchasing a lot more than twenty-five thousand dollars worth of silver. Tran. at 111–12.

After Mr. Soethe wired money to Sterling he testified that he checked his online statement and noticed previously unknown fees associated with the purchase. Tran. at 112–14. Mr. Soethe subsequently called Mr. Zofay to question the fees, but was eventually explained what each fee was for. Tran. at 114. Despite the initial misunderstanding, Mr. Soethe continued to invest more money with Sterling. Tran. at 114.

On cross-examination, Mr. Soethe admitted that he actually had all of the documents disclosing fees, risks, and other information associated with his investment *prior to* engaging in any kind of transaction with Sterling. Tran. at 124. Mr. Soethe further admitted that immediately after concluding his call with the compliance department, he knew he was borrowing money to fund his purchase of precious metals. Tran. at 129. Finally, Mr. Soethe testified that on one occasion there was an unauthorized trade executed on his account, but after an investigation by Mr. Zofay the charge was unwound at no cost to him. Tran. at 134.

### 3. Defendants Witness Francis Ryan Zofay

Mr. Zofay testified that he is the primary principle for Sterling. Tran. at 162. He asserted that he submitted a "compliance script" to the Florida Department of Agriculture that was religiously adhered to by his staff. Tran. at 170–71. That script,

which was presented at trial and included in Defendants' closing brief to this Court, had the following statements included:

- "Now, ＿＿＿, of course I can't guarantee profits. So, ＿＿＿, because investments like these aren't for everyone, let me ask you again ... can you truly afford and risk and [sic] investment of $＿＿＿." Script, DE 34-1 at 3.
- "After you review the program and materials . . . ." Script at 3.
- "My secretary is going to send you research material, news articles and some risk disclosures so you can fully understand the market we're going into." Script at 3.
- "We are discussing an investment of $＿＿＿ ... Now with Silver trading at $18 an ounce, on a one to one basis, you would only be able to purchase ＿＿＿ ounces. However, with leverage factor of 2½ times, we have the ability to leverage ＿＿＿ ounces of Silver ..." Script at 4.

Mr. Zofay also confirmed that customers were required to submit forms acknowledging the risks associated with the purchase prior to investment with Sterling. Tran. at 192–93.

### 4. Closing Arguments

As agreed to by the parties, the parties filed written closing arguments on July 2, 2012, and responses on July 9, 2012.

## II. Legal Standard

"A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion' as to each of the four prerequisites." *Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr, S.A.,* 320 F.3d 1205, 1210 (11th Cir.2003) (citing *McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1306 (11th Cir.1998)). "The purpose of a preliminary injunction is to preserve

the positions of the parties as best we can until a trial on the merits may be held." *Bloedorn v. Grube,* 631 F.3d 1218, 1229 (11th Cir.2011) (citing *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981)).

■ Normally, a private party seeking a preliminary injunction under Federal Rule of Civil Procedure 65 must demonstrate (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction is issued; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction might cause the non-moving party; and (4) if issued, the injunction would not be adverse to the public interest. *BellSouth Telecommunications, Inc. v. MCIMetro Access Transmission Services, LLC,* 425 F.3d 964, 968 (11th Cir.2005). Pursuant to 15 U.S.C. § 53(b), however, the FTC is freed from its burden of proving irreparable harm, and need not prove a "substantial" likelihood of success. *F.T.C. v. University Health, Inc.,* 938 F.2d 1206, 1217–18 (11th Cir.1991). The reduced burden only requires the Court to consider the likelihood of ultimate success by the FTC and a balancing of equities between the parties. *Id.* at 1217.

### III. Discussion

■ After carefully reviewing the motions, briefs, affidavits, evidence, and considering the credibility of the witnesses that testified at the evidentiary hearing, the Court concludes that the FTC has not met its burden of proving that it is likely to succeed on the merits. All of the claims outlined in the FTC's Complaint and Motion ultimately rely on the assumption that Defendants engaged in "deceptive" practices. The two witnesses for the FTC testified that they did not fully understand the risks or fees associated with their investments, but they both acknowledged receiving literature and materials outlining these risks before expending any funds *and* knew there was a risk associated with the investments. Further, and perhaps even more persuasive, both of the FTC's witnesses admitted to investing additional funds with Sterling even *after* expressing concern with the high fees associated with their initial investment.

The cross-examination of the FTC's witnesses demonstrated they, in fact, received disclosure material which refuted their assertions that Defendant either misrepresented or withheld material facts relevant to the investments. This demonstrates the danger of relying upon hearsay affidavits, not subject to cross-examination, in granting injunctive relief. In view of the cross-examination of the FTC's witnesses, the Court cannot place any weight on the witnesses presented by the FTC by way of affidavit. For these reasons, the Court finds that the FTC has not met its heavy burden for the granting of extraordinary injunctive relief. This finding does not, however, preclude a different result after a full trial on the merits. *E. Remy Martin & Co., S.A. v. Shaw–Ross Intern. Imports, Inc.,* 756 F.2d 1525, 1528 n. 1 (11th Cir. 1985).

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Plaintiff Federal Trade Commission's ("FTC") Motion for Temporary Restraining Order with Asset Freeze, Appointment of a Receiver, and Order to Show Cause Why Preliminary Injunction Should Not Issue (DE 3) is **DENIED.**