[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-13598

_____

YORKTOWN SYSTEMS GROUP INC,

Plaintiff-Appellee,

*versus*

THREAT TEC LLC,

Defendant-Appellant,

PATRICK ROUSEY,

Defendant.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 5:22-cv-00496-LCB

_____

Before GRANT, ABUDU, and ED CARNES, Circuit Judges.

ED CARNES, Circuit Judge:

The parties in this case are defense contractors who are involved in the Small Business Administration's mentor-protégé program, which helps smaller businesses compete for government contracts. *See generally* 13 C.F.R. § 125.9. It does so by enticing larger businesses to partner with and mentor smaller ones. The program is designed so that both companies in the relationship will benefit. The benefits for the protégé are the mentor's greater experience, knowledge, and resources, while the benefit for the mentor is access to some government contracts, set aside for small businesses, that they would not otherwise have. *See id.* § 125.9(a).

Or at least that is the theory. It is not a perfect theory because it assumes that the companies who agree to a mentor-protégé relationship will get along, but companies are run by people and sometimes people don't get along. They didn't in this case. The business relationship between Yorktown the mentor and Threat Tec the protégé soured. The result was more animosity than agreement, which made the mentoring and protégé-ing dicey, difficult, and doubtful. And litigation followed, as night follows day.

Yorktown filed a lawsuit against Threat Tec. Its amended complaint claimed, among other things, breach of contract and breach of fiduciary duty. It sought, along with other relief, a preliminary injunction to bar Threat Tec from terminating a subcontract and from depriving Yorktown of its rights under the parties' joint venture agreement. Following a hearing, the district court granted the injunction, finding that Yorktown had shown a substantial likelihood of success on the merits of its breach of contract and breach of fiduciary duty claims and that it faced irreparable harm.

In granting the preliminary injunction, the court found that in the proceedings: Threat Tec's CEO Jim Crawford had made false statements in his declarations; his testimony at the preliminary injunction hearing was generally not entitled to much weight; and his lack of candor with the court led it to believe that Threat Tec's motives for terminating one of the parties' agreements were "not entirely ethical." The court also found that it was "the epitome of disloyalty" for a protégé company like Threat Tec to "attempt to use its status as the manager of the [parties' joint venture] to cut its mentor out of the very contracting opportunity the mentor helped the protégé to secure." The court ordered Threat Tec to refrain from taking any action that would deprive Yorktown of its rights and benefits under the parties' joint venture agreement.

Threat Tec filed this interlocutory appeal of that preliminary injunction. For reasons we will explain, we conclude that the district court's factfindings were not clearly erroneous, and it acted

within its considerable discretion by granting preliminary injunctive relief to Yorktown based on its breach of fiduciary duty claim. Because that conclusion resolves this appeal, we need not and do not address whether the preliminary injunction was also justified on the breach of contract claim.  (The relief Yorktown sought was the same for both claims.)

## I. Background Facts and Procedural History

As we have indicated, the SBA's mentor-protégé program enables a larger business to pair with a smaller one so that they can form a joint venture to pursue government contracts.  *See* 13 C.F.R. § 125.9(a) (setting out rules governing the program).  Yorktown and Threat Tec entered into an "All Small Mentor-Protégé Program Mentor-Protégé Agreement" (the M-P agreement), which is required before launching the joint venture to seek government contracts.  *See id*. § 125.9(d)(1)(i) (providing that the "SBA must approve the mentor-protégé agreement before the two firms may submit an offer as a joint venture on a particular government prime contract or subcontract").  Yorktown and Threat Tec submitted their M-P agreement to the SBA, and it approved that agreement and accepted them into the program.

The program also required Threat Tec and Yorktown to enter into a joint venture agreement that met certain regulatory requirements.  *See* 13 C.F.R. § 125.8.  They did so, entering into what we'll call "the JV agreement" and forming a limited liability company that we'll call "the JV."

The JV agreement is a contract governed by Delaware law. In accordance with regulatory requirements, as the protégé Threat Tec is the JV's manager with a 51% interest, and Yorktown is a member of the JV with a 49% interest. *See* 13 C.F.R. § 125.8(b)(2)(ii), (iii). The JV itself, however, is in regulatory speak "unpopulated," meaning that it has no employees. *See id.* § 121.103(h)(1)(i). The JV agreement meets regulatory requirements by dividing the work (the "source of labor" in regulatory speak) and the responsibilities for contract performance between the two companies. *Id.* § 125.8(b)(2)(i)–(xii).

The JV bid on the United States Army's Training and Doctrine Command G-2 Contact (the TRADOC contract). The TRADOC work involves support for Army intelligence, including IT support and training. The total value of the TRADOC contract is about $165 million.

The JV was awarded the TRADOC contract in July 2020. In an addendum that became part of their JV agreement (the Addendum), Threat Tec and Yorktown agreed to a "joint venture workshare," dividing the work on the TRADOC contract. Under the Addendum, Threat Tec was "allocated" 50.6% of the TRADOC work and Yorktown 49.4% of it. That allocation was in keeping with the regulatory requirement that "a protégé must perform at least 40% of the work performed by a joint venture." 13 C.F.R. § 125.8(c)(4).

Because the JV itself functions as the prime contractor on the TRADOC contract and has no employees, it entered subcontracts with Yorktown and with Threat Tec for them to perform the TRADOC work. The subcontract between the JV and Yorktown was for twelve months, beginning on August 9, 2020. But there are four one-year option periods for renewal, which the JV has the "unilateral right" to exercise. The end of the fourth and final option period is August 8, 2025. The subcontract also has a provision that allows the JV (as the prime contractor) to terminate the subcontract with Yorktown "for its convenience." That provision states:

> [The JV] shall have the right, in addition to any other rights set forth in this Agreement, to terminate this Agreement and Orders issued hereunder, in whole or in part, for its convenience by delivering to Subcontractor [Yorktown] a Notice of Termination specifying the extent of termination and the effective date.

The JV exercised the first option period, extending the subcontract to August 8, 2022. But before that first option period ended, the parties' business relationship hit the rocks.

On April 19, 2022, Yorktown filed this lawsuit against Threat Tec. Threat Tec filed an unopposed motion to extend its deadline to respond to the complaint until May 27, 2022, which the district court granted. The day before that deadline, on May 26, 2022, Threat Tec's CEO Crawford sent Yorktown a letter on the JV's letterhead, signed by Crawford as manager of the JV. The letter stated that the JV was terminating Yorktown's subcontract based

on the termination for convenience provision in the subcontract. The termination would be effective just hours later, at one minute after midnight.  And, through Crawford, the JV directed Yorktown to stop all work on the $165 million TRADOC contract by 12:01 a.m. EST.

Understandably upset, Yorktown filed an emergency motion for a temporary restraining order that same day.  It asked the district court to enjoin Threat Tec and anyone acting along with it from terminating Yorktown's subcontract for the TRADOC work and from depriving Yorktown of its rights and benefits under the JV agreement, including its workshare for the TRADOC contract.

In an order issued the next day, the court entered the TRO, granting the relief that Yorktown sought.  The order stated that Threat Tec's actions, taken the Friday before Memorial Day weekend, left "Yorktown virtually no time to obtain relief."  The court also noted that Yorktown had alleged that Threat Tec "was, at that very moment, attempting to lure away Yorktown's employees to come and work for Threat Tec" and that those employees were "not easily replaceable [by Yorktown] due to their very specific skill sets."

Yorktown later amended its complaint.  The amended complaint included two claims related to its contention that Threat Tec was attempting to steal its TRADOC workshare.  Those claims were for breach of the JV agreement and breach of fiduciary duty. Among other things, Yorktown sought specific enforcement of its

rights under the JV agreement, including an injunction to prevent Threat Tec from taking its TRADOC workshare.

After an evidentiary hearing, the district court entered a preliminary injunction. It found that Yorktown had shown a likelihood of success on the merits of its claims for breach of contract and for breach of fiduciary duty. It also found that Yorktown faces irreparable harm if it loses the TRADOC work, that the balance of harms favors Yorktown, and that an injunction serves the public interest. This is Threat Tec's interlocutory appeal of that order. *See* 28 U.S.C. § 1292(a)(1).

## II. Discussion

Our review of the district court's decision to grant a preliminary injunction to Yorktown is narrow in scope. *See Carillon Imps., Ltd. v. Frank Pesce Int'l Grp. Ltd.*, 112 F.3d 1125, 1126 (11th Cir. 1997). We will reverse "only if there is a clear abuse of discretion." *Id.* That's because "[t]he expedited nature of preliminary injunction proceedings often creates not only limits on the evidence available but also pressure to make difficult judgments without the luxury of abundant time for reflection." *BellSouth Telecomms., Inc. v. MCI-Metro Access Transmission Servs., LLC*, 425 F.3d 964, 968 (11th Cir. 2005) (quotation marks omitted). And as a result, "[t]hose judgments, about the viability of a plaintiff's claims and the balancing of equities and the public interest, are the district court's to make

and we will not set them aside unless the district court has abused its discretion in making them." *Id.* (quotation marks omitted).

As we have mentioned, to resolve this appeal the only claim we need to address is the one for breach of fiduciary duty. We will not assess the merits of it beyond what is "necessary to determine the presence or absence of an abuse of discretion." *Carillon Imps.*, 112 F.3d at 1126 (quotation marks omitted). We review only for clear error the district court's underlying factfindings, although we review *de novo* its legal conclusions. *L.E. ex rel. Cavorley v. Superintendent of Cobb Cnty. Sch. Dist.*, 55 F.4th 1296, 1299 (11th Cir. 2022).

For preliminary injunctive relief to be warranted, the district court must find that the party seeking it has satisfied four prerequisites by showing that: (1) there is "a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant is greater than any damage the proposed injunction may cause the opposing party; and (4) the injunction, if issued, will not disserve the public interest." *Carillon Imps.*, 112 F.3d at 1126. Threat Tec contends that the district court abused its discretion because Yorktown failed to establish the first two elements: likelihood of success on the merits and a showing of irreparable injury that can be prevented only by means of injunctive relief, meaning that money damages couldn't remedy the harm.

### A. Yorktown's Likelihood of Success on the Merits of Its Breach of Fiduciary Duty Claim against Threat Tec

As we've mentioned, Threat Tec owns 51% of the JV and Yorktown owns the remaining 49%.  *See generally* 13 C.F.R. § 125.8(b)(2)(iii) (providing that "the small business [protégé] must own at least 51% of the joint venture entity").  The JV agreement along with the Addendum that is incorporated into it allot Yorktown and Threat Tec their respective parts of the TRADOC workshare.  Yorktown's breach of fiduciary duty claim asserts that Threat Tec is misusing its control of the JV along with the termination clause in the subcontract to try to steal Yorktown's TRADOC workshare.

In determining that Yorktown is likely to succeed on the merits of its breach of fiduciary duty claim, the district court found that the evidence, including Threat Tec CEO Crawford's testimony, established that "Threat Tec, as the JV's manager, was not acting in the interests of its members when it sought to unilaterally dissociate Yorktown from the TRADOC contract."  It was acting in its own interest and against Yorktown's interest. The protégé turned on the mentor. That is why the court aptly characterized what Threat Tec had done to Yorktown as "the epitome of disloyalty."  Finally, the court concluded that Threat Tec CEO "Crawford's lack of candor with the Court," led it "to believe that his motives for terminating the subcontract were not entirely ethical" and that Threat Tec had provided no "credible explanation for its actions."

Our review of those findings is only for clear error, *see L.E. ex rel. Cavorley*, 55 F.4th at 1299, and they are not clearly erroneous.

*See Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985) ("[W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error."); *United States v. Sanchez*, 30 F.4th 1063, 1072 (11th Cir. 2022) ("A district court's credibility determination gets special deference, and we accept it unless it is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it.") (quotation marks omitted).

The breach of fiduciary duty claim derives from Threat Tec's obligations under the JV agreement. That agreement contains a choice of law provision stating that "[t]he laws of the State of Delaware shall govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties arising hereunder." The Addendum, which is incorporated into the JV agreement as "a supplement to [its] terms and conditions," is also governed by Delaware law. The district court applied Delaware law to the breach of fiduciary duty claim, and neither party takes issue with that. We will, of course, also apply Delaware law to Yorktown's breach of fiduciary duty claim.

Under Delaware law, "[a] claim for breach of fiduciary duty requires proof of two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty." *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch.), *aff'd sub nom. ASDI, Inc. v. Beard Rsch.,*

*Inc.*, 11 A.3d 749 (Del. 2010). The district court determined that in the absence of a contrary provision in the JV agreement, Threat Tec, as manager of the JV, owed Yorktown (its fellow member in the JV, which is a limited liability corporation), the traditional duties of loyalty and care that exist between members of an LLC. We agree.

The JV agreement between Threat Tec and Yorktown is a limited liability company agreement, the JV is the limited liability company, and Threat Tec is the manager of it. Delaware's Limited Company Act expressly allows parties to an LLC agreement to expand, restrict, or eliminate the fiduciary duties they would otherwise owe to one another. It provides:

> To the extent that, at law or in equity, a member or manager or other person has duties (including fiduciary duties) to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement, the member's or manager's or other person's duties *may be expanded or restricted or eliminated* by provisions in the limited liability company agreement; provided, that the limited liability company agreement may not eliminate the implied contractual covenant of good faith and fair dealing.

Del. Code Ann. tit. 6, § 18-1101(c) (emphasis added). The stated policy of the Act is to "give the maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements." *Id.* § 18-1101(b); *see also Baldwin v. New Wood Res. LLC*, 283 A.3d 1099, 1117 (Del. 2022).

But even though Delaware law would have allowed a provision in the JV agreement restricting or eliminating fiduciary duties that Threat Tec owed to Yorktown, *see Baldwin*, 283 A.3d at 1117, the agreement does not contain such a provision. And the LLC Act, as amended by the Delaware General Assembly in 2013, states that "[i]n any case not provided for in this chapter, the rules of law and equity, including the rules of law and equity relating to fiduciary duties and the law merchant, shall govern." Del. Code Ann. tit. 6, § 18-1104 (2013); *accord Feeley v. NHAOCG, LLC*, 62 A.3d 649, 660 (Del. Ch. 2012) (recognizing that "[n]umerous Court of Chancery decisions hold that the managers of an LLC owe fiduciary duties" in the absence of restrictions on those duties in the LLC agreement); *see also Douzinas v. Am. Bureau of Shipping, Inc.*, 888 A.2d 1146, 1149–50 (Del. Ch. 2006); *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 153 (Del. Ch. 2004); *see generally* Mohsen Manesh, *Damning Dictum: The Default Duty Debate in Delaware*, 39 J. Corp. L. 35, 67–68, 70 (2013) (recognizing that the Delaware General Assembly amended the LLC Act in 2013 to clarify that the default fiduciary duties of loyalty and care apply unless the LLC agreement restricts or eliminates those duties). Because the JV agreement contained no provision limiting the traditional fiduciary duties of loyalty and care, Threat Tec, as the managing member of the JV, owes those duties to its fellow member Yorktown.

The Court of Chancery of Delaware has recognized that corporate fiduciaries (officers and directors) breach their duty of loyalty when they "use their position of trust and confidence to further

their private interests." *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 842 (Del. Ch.) (quotation marks omitted), *judgment entered sub nom. In re Metro Storage Int'l LLC v. Harron*, No. 2018-0937-JTL, 2022 WL 2473354 (Del. Ch. July 5, 2022). "The duty of loyalty includes a requirement to act in good faith," and when a "fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation," that can constitute a lack of good faith. *Id.* (quotation marks omitted).

Based on the evidence presented at the preliminary injunction hearing, the district court found that Threat Tec's actions were designed to advance its own interests, not the interests of Yorktown or their joint interests or those of the JV itself. The court determined that Threat Tec attempted to use the subcontract's termination for convenience provision to cut Yorktown out of its TRADOC workshare. It found that "Threat Tec, as the JV's manager, was not acting in the interests of its members when it sought to unilaterally dissociate Yorktown from the TRADOC contract." Threat Tec's sole justification for its actions is that the subcontract permits termination for convenience; it attempts to use that one provision in the subcontract to eradicate any duty of loyalty and care it owes to Yorktown as its fellow member in the JV.

The district court found that it was likely a breach of Threat Tec's fiduciary duties of loyalty and care to attempt, as managing member of the JV, to terminate the JV's subcontract with Yorktown within hours after Yorktown received the termination letter. The court also found that Threat Tec's motives were "not entirely

ethical," and its attempt "to cut its mentor out of the very contracting opportunity the mentor helped" it secure was the "epitome of disloyalty." Threat Tec's underhanded move violated the duties it owes Yorktown under the JV agreement and its Addendum.

The move also was likely not in compliance with the terms of the subcontract allowing it to terminate for convenience, which is Threat Tec's sole basis for asserting the legitimacy of its actions. That's because Threat Tec's obligations to Yorktown under the subcontract remain subject to the SBA regulations, the M-P agreement, and the JV agreement that form the basis of the parties' business relationship. The SBA regulations, the M-P agreement, and the JV agreement do provide for the termination of the mentor-protégé agreement or the withdrawal of a member of the JV when certain requirements are met. But the district court heard live testimony and considered evidence establishing that Threat Tec didn't comply with those requirements. For example, the SBA regulations provide that the M-P agreement may be terminated by either party "with 30 days advance notice to the other party to the mentor-protégé relationship and to SBA." *See* 13 C.F.R. § 125.9(e)(4). Threat Tec did not provide 30 days notice — or 30 hours for that matter. And as the district court observed, "the JV agreement bound these parties in a relationship not easily dissolved."

As we have already pointed out, the district court's factfindings, which we review only for clear error, are entitled to significant deference. *See L.E. ex rel. Cavorley*, 55 F.4th at 1299. Layered

16                    Opinion of the Court                    22-13598

on top of that is the deference we afford district courts in their decisions about preliminary injunctive relief generally. *Carillon Imps.*, 112 F.3d at 1126; *see also BellSouth Telecomms.*, 425 F.3d at 968 ("We begin our review by noting how deferential it is.") (quotation marks omitted). We look to the merits merely to assess the court's exercise of that discretion. *Carillon Imps.*, 112 F.3d at 1126. And when we take that look, we can easily see that the district court acted within its discretion when it determined that Yorktown is likely to succeed on its breach of fiduciary duty claim based on its finding that protégé Threat Tec attempted to cut its mentor Yorktown out of its contractually specified workshare on a $165 million government contract. As a result, the "most important preliminary-injunction criterion" — likelihood of success on the merits — favors affirming the district court. *See Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1128 (11th Cir. 2022).

## B. Yorktown's Showing of Irreparable Injury that Money Damages Cannot Remedy

Threat Tec also contends that the district court abused its discretion when it found that Yorktown had shown that it would suffer irreparable injury if the injunction didn't issue. A party seeking a preliminary injunction must make that showing, and "[a]n injury is 'irreparable' only if it cannot be undone through monetary remedies." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990). [1]

---

[1] The JV agreement includes a specific performance provision stating that a breach of it will result in irreparable harm and that monetary damages

Evidence of intangible harms specific to the circumstances of this case, such as potential damage to Yorktown's business reputation and the difficulty, if not impossibility, of quantifying in monetary terms the injury from losing highly skilled and experienced employees, supports the district court's finding that irreparable harm would occur if Threat Tec were allowed to deprive Yorktown of its interest in the JV.

The district court considered evidence that Yorktown has about ninety-five highly trained employees doing specialized work on the TRADOC contract, "including scientists and high-end military analysts." And it considered that those employees are not easily replaceable. Yorktown's CEO Bryan Dyer testified that it takes two to three months to find, vet, interview, and get approval to hire a senior military analyst. The day after Threat Tec's CEO Crawford sent the letter terminating the subcontract and attempting to terminate Yorktown's TRADOC work, government employees approached Yorktown employees and told them to go apply for their jobs on the Threat Tec website. Dyer testified that as a result Yorktown lost two highly skilled employees, which meant losing institutional knowledge and experience needed to bid on future government contracts.

---

would not provide adequate relief. The district court recognized that provision but also found that Yorktown had established irreparable harm separate and apart from it. We agree. And because we do, we need not and do not consider that provision in the JV agreement and what effect, if any, it might have.

The court also heard testimony that without the TRADOC work, Yorktown would have to lay off some of its headquarters staff, after years of effort "finding the right people, investing in their training, doing professional development, [and] mentoring them." And losing the employees who do the TRADOC work would wipe out Yorktown's Intelligence Surveillance Reconnaissance (ISR) work company-wide. The district court heard testimony that without ISR capability, Yorktown would be unable to bid on other government contracts involving that kind of work, which Yorktown views as the "future" of its business and into which it has "invested heavily." *See Foodcomm Int'l v. Barry*, 328 F.3d 300, 302–03, 304 (7th Cir. 2003) (concluding that plaintiff company's two former employees usurped a corporate opportunity and breached their fiduciary duties, and the plaintiff company had shown irreparable harm justifying the grant of a preliminary injunction based on evidence of its "inability to attempt to maintain its relationship with [its former customer] and its complete loss of that relationship").

When a contracting officer evaluates whether to award a government contract to a company, that company's past performance is considered. *See* 48 C.F.R. § 15.304(c)(3). Abrupt termination of TRADOC work could affect an assessment of Yorktown's past performance, harming its reputation and impeding its ability to compete for other government contracts in the future. *See Beacon Assocs., Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277, 288 (D.D.C. 2018) (finding that abrupt termination of a subcontract would cause a subcontractor irreparable reputational harm in competing for government contracts); *see also BellSouth Telecomms.*, 425 F.3d at

970 (affirming the grant of a preliminary injunction and explaining that "the loss of customers and goodwill is an irreparable injury") (quotation marks omitted); *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1309–10 (11th Cir. 1998) (affirming the grant of a preliminary injunction and concluding that the district court did not err in finding irreparable injury based on "loss of goodwill," which included the likelihood of reputational harm and loss of customers); *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991) (affirming the grant of a preliminary injunction and concluding that the district court properly found that irreparable injury had been shown based on the likelihood of losing goodwill and long-time customers as well as the likelihood of layoffs).

In this case, the district court also found that "while it may be a straightforward task to calculate the lost profit on a single contract, quantifying future losses of the type [Yorktown CEO] Dyer described is far more difficult (if not impossible)." That kind of exceptional difficulty in determining the scope of economic damages contributes to the finding that Yorktown faces a threat of irreparable harm. *See Jacksonville Mar. Ass'n v. Int'l Longshoremen's Ass'n*, 571 F.2d 319, 322, 325–26 (5th Cir. 1978) (affirming the grant of a preliminary injunction and concluding that irreparable harm had been established because economic damages were difficult to calculate under the circumstances); *see also Lakedreams v. Taylor*, 932 F.2d 1103, 1109 (5th Cir. 1991) ("[W]hen economic rights are especially difficult to calculate, a finding of irreparable harm may be appropriate.").

Considering the particular facts and circumstances of this case and the evidence presented, the district court did not abuse its considerable discretion when it found that Yorktown had shown irreparable harm. *See BellSouth Telecomms.*, 425 F.3d at 968.

### C. The District Court Did Not Exceed The Scope of Its Equity Powers

Threat Tec contends that granting injunctive relief under these circumstances exceeds the court's equity powers. It contends that, for one thing, the court's order imposes an impermissible "mandatory" injunction to "do business." And it argues that the court has, in effect, ordered it to specifically perform what it characterizes as a personal services contract.

Threat Tec's arguments mischaracterize the parties' complex business arrangement and the effect of the preliminary injunction. The district court's order is a prohibitive injunction that forbids Threat Tec from violating its fiduciary duties to Yorktown by using its position as managing member of the JV to alter the specific workshares that the Addendum to it allots to the two companies. Threat Tec's CEO Crawford testified that the two companies will still be in business together as members of the JV even if the JV's subcontract with Yorktown is terminated. He agreed that "terminating the subcontract just means that Yorktown doesn't get to work, that's the only thing that changes." (As though that were not enough.)

To the extent that the companies are required to continue to do business together, that requirement arises not from the court-

ordered injunction but from the government-regulated mentor-protégé contractual arrangement which they chose to enter and through which the JV bid on and obtained the TRADOC contract that they agreed to perform together. By ordering Threat Tec to refrain from using its position as managing member of the JV to push Yorktown out of its share of the work on the TRADOC contract, the district court did not exceed the scope of its equitable authority.

Threat Tec also insists that equity doesn't permit ordering it to specifically perform what it characterizes as a personal services contract. It relies on *Rutland Marble Co. v. Ripley*, 77 U.S. (10 Wall.) 339, 358 (1870), where the Supreme Court concluded that a specific performance injunction was impermissible because of the nature of the parties' agreement. That agreement called "for a perpetual supply of marble," and it was a "personal contract to deliver marble of certain kinds, and in blocks of a kind." *Id.* The Court was "incapable of determining whether [the marble deliveries] accord[ed] with the contract or not." *Id.* Similarly, in another decision that Threat Tec relies on, *Texas & P. Ry. Co. v. City of Marshall*, 136 U.S. 393, 405 (1890), the Court held that a specific performance injunction was impermissible because it would require a company "without limit of time, to keep its principal office of business" in a particular city. *Id.* It would also require the company "to keep its main machine-shops there, and its car-works there, and its other principal offices there" in perpetuity. *Id.*

*Rutland Marble* and *Texas & P. Railway* don't apply here. Most significantly, the injunctions in those cases would have bound the companies to continue doing business forever (or whatever passes for forever in this world). The JV, by contrast, is not designed to operate in perpetuity. It has an end date. June 2025 is the anticipated date that the parties' 2019 mentor-protégé agreement will expire. *See* 13 C.F.R. § 125.9(e)(5) (providing for a presumptive 6-year term). And the TRADOC contract is set to expire in August 2025. Plus, it's undisputed that the parties are going to continue doing business together anyway. The preliminary injunction doesn't force them into business; it prevents Threat Tec from cutting Yorktown out of its TRADOC workshare.

"The very nature of equitable power — the thing that distinguishes it from law — is its flexible and discretionary nature, its ability to respond to real-world practicalities, and its general aversion to rules that let bad actors capitalize on legal technicalities." *United States v. Askins & Miller Orthopaedics, P.A.*, 924 F.3d 1348, 1359 (11th Cir. 2019). The court's injunction is tailored to the parties' business arrangement and is fitted to its findings about Threat Tec's attempt to use its position as manager of the JV to cut Yorktown out of its TRADOC workshare.[2]

---

[2] Nor did the district court err in finding that, based on the parties' business arrangement, the JV entity isn't a necessary party to this lawsuit. The court determined: "All the parties are present and accounted for in this litigation. Further, Threat Tec is the managing member of the JV. Therefore, any order enjoining Threat Tec from taking certain actions related to the JV would have the effect of enjoining the JV as well." We agree.

22-13598                 Opinion of the Court                 23

### III. Conclusion

Threat Tec has failed to show that the district court abused its discretion in granting Yorktown a preliminary injunction based in its breach of fiduciary duty claim.

**AFFIRMED.**

---

The fiduciary duties involved in this case arise from the JV agreement; those duties exist between Threat Tec and Yorktown, who are the only parties to the agreement that created the JV. The JV, which is wholly comprised of Threat Tec and Yorktown, has no employees of its own. Because Threat Tec controls the JV as its managing member, the injunction against Threat Tec properly had the effect of enjoining the JV as well. Under the specific circumstances of this case, an injunction that affects the JV isn't beyond the scope of the district court's authority. As the court recognized, every entity that has a direct interest in this litigation is actively involved in it.