**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GOPETS LTD., a limited liability
Korean corporation,
                    *Plaintiff-Appellee,*

            v.

EDWARD HISE, an individual,
                    *Defendant-Appellant,*

            and

JOSEPH HISE, an individual; DIGITAL
OVERTURE, INC., a California
corporation,
                    *Defendants.*

No. 08-56110

D.C. No.
2:07-cv-01870-
AHM-VBK

GOPETS LTD., a limited liability
Korean corporation,
                    *Plaintiff-Appellee,*

            v.

EDWARD HISE, an individual,
                    *Defendant,*

DIGITAL OVERTURE, INC., a
California corporation,
                    *Defendant,*

            and

JOSEPH HISE, an individual,
                    *Defendant-Appellant.*

No. 08-56112

D.C. No.
2:07-cv-01870-
AHM-VBK

18005

GoPets Ltd., a limited liability
Korean corporation,
             *Plaintiff-Appellee,*

             v.                                No. 08-56114

Edward Hise, an individual;                    D.C. No.
Joseph Hise, an individual,                    2:07-cv-01870-
             *Defendants,*                     AHM-VBK

             and                               OPINION

Digital Overture, Inc., a
California corporation,
             *Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of California
A. Howard Matz, District Judge, Presiding

Argued and Submitted
January 10, 2011—Pasadena, California

Filed September 22, 2011

Before: Diarmuid F. O'Scannlain, William A. Fletcher, and
Richard R. Clifton, Circuit Judges.

Opinion by Judge William A. Fletcher

**COUNSEL**

Michael Allen Firestein, Robert H. Horn, PROSKAUER ROSE LLP, Los Angeles, California, for the plaintiff/appellee.

Edward Hise, Pro se, Simi Valley, California, Joseph Hise, Pro se, Simi Valley, California, Stephen Hume Sturgeon, STEPHEN H. STURGEON & ASSOCIATES, Potomac, Maryland, for the defendants/appellants.

## OPINION

W. FLETCHER, Circuit Judge:

The Anticybersquatting Consumer Protection Act ("ACPA") prohibits "cybersquatters" from registering internet domain names that are identical or confusingly similar to registered service marks and trademarks. *See* 15 U.S.C. § 1125(d)(1). The prohibition contained in § 1125(d)(1) applies when a domain name is identical or confusingly similar to a mark that is distinctive "at the time of registration of the domain name." *Id.* The primary question before us is whether the term "registration" applies only to the initial registration of the domain name, or whether it also applies to a re-registration of a currently registered domain name by a new registrant. We hold that such re-registration is not a "registration" within the meaning of § 1125(d)(1).

### I. Background

Defendant Edward Hise registered the domain name gopets.com in his own name in March 1999. He developed a business plan for gopets.com as part of a marketing class in which he was then enrolled. According to the business plan, Hise and a cousin who was a veterinarian would develop the site into "a pet owner resource covering health, safety, nutrition, animal behavior, training, competition, abuse, pets and children, free advice from veterinarians, and the pet industry."

Edward and his brother Joseph Hise own the corporation Digital Overture. Among other things, the Hises perform

internet-related services for clients, including registering and maintaining domain names. The Hises and Digital Overture (collectively, "the Hises") have registered more than 1300 domain names in the last decade. Most appear to be plausible names for future internet sites rather than names of existing businesses. They frequently register similar domain names at the same time. For instance, they registered ehinges.com, ebenches.com, erivets.com, and esconces.com on the same day.

In 2004, Erik Bethke founded the company GoPets Ltd. in Korea. GoPets Ltd. created a game called GoPets featuring virtual pets that move between the computers of registered users. GoPets Ltd. filed an application to register the service mark "GoPets" in the United States on September 30, 2004. The mark was duly registered in November 2006. The registration shows that the first use of the term in commerce occurred on August 20, 2004.

Beginning in 2004, Bethke made several unsuccessful attempts to purchase the gopets.com domain name from the Hises. In response to Bethke's initial email inquiry about the domain name, Edward Hise wrote on September 1, 2004, that he had initially been "dedicated to building a business" at gopets.com, but because his other web businesses were thriving, he was open to selling the domain name to a "serious buyer[ ]." He said he was holding an auction for the domain name and invited Bethke to submit a bid by September 15.

Bethke did not respond immediately. On October 11, he wrote to Edward Hise again, noting that Hise still owned the domain name—"so presumably you did not have any other serious offers." Bethke offered to pay $750 for the domain name. The Hises did not respond. In January 2005, Bethke again inquired about the domain name, this time through a friend. Edward Hise wrote back several months later, stating that he would not sell the domain name "for little or nothing" and that another group had offered to develop the site and

share the profits. On May 16, 2005, Bethke wrote to Joseph Hise:

> Last year in October I offered you $750 for the domain after declining to participate in your blind bidding system.
>
> You also failed to answer our communications both in email as well as postal mail.
>
> We are proceeding with the ICA[N]N domain dispute claim . . . .
>
> . . .
>
> My very last offer is $100 — the exact same cost as going through ICA[N]N, and frankly that is generous for I would far rather donate our money to ICA[N]N.

ICANN, the Internet Corporation for Assigned Names and Numbers, is an international group that offers non-binding arbitration for adjudicating disputes over domain names. A year later, on May 23, 2006, GoPets Ltd. filed a complaint against Edward Hise with the World Intellectual Property Organization ("WIPO"), which administers ICANN's Uniform Dispute Resolution Policy.

On July 26, 2006, a WIPO arbitrator decided in favor of Edward Hise. The arbitrator found that the gopets.com domain name was confusingly similar to GoPets Ltd.'s service mark, and he "wishe[d]. . . to make it clear that [he was] unconvinced" that the Hises ever had serious plans to develop a website at gopets.com. Nevertheless, the arbitrator held that WIPO rules only compel the transfer of a disputed domain name if the name was initially registered in bad faith. Since Edward Hise had registered gopets.com five years before

GoPets Ltd. was founded, gopets.com was not registered in bad faith.

On October 30, 2006, after the WIPO decision, Bethke offered to purchase gopets.com from the Hises for $5,000. After a telephone conversation, Bethke increased his offer to $40,000 on November 15. On November 20, Bethke emailed again, stating that his company owned the domain name gopetslive.com, and that they were about to begin a marketing campaign. They preferred to use gopets.com in the campaign and were still willing to pay $40,000 for it, but they needed to commit to a particular domain name by December 11. After December 11, "we would still be interested in gopets.com, but it loses all real urgency."

On December 12, Edward Hise sent Bethke an email, attaching a four-page letter. The email requested that Bethke forward the letter to GoPets Ltd.'s investors. The email stated that within forty-eight hours Hise would send the letter directly to the investors. The letter, signed by both Edward and Joseph Hise, presented what they called "Acquisition Considerations." It warned the investors that if GoPets Ltd. used the gopetslive.com domain name instead of gopets.com, the result would be to "continue to confuse newly adopted gopetslive.com" users. The letter noted that Bethke had said that some users were already confused. The letter stated, further, that if GoPets Ltd. bought gopets.com, "search engine results would be dramatically improved." But "[i]f GoPets.com were developed further, gopetslive.com may face competitive Meta Tagging." Metatagging is inserting words into the code of a web page that help determine how it appears in search results. By mentioning "competitive Meta Tagging," the Hises were threatening to add metatags to the code of gopets.com, so that users who wanted to access the GoPets Ltd. game found at gopetslive.com would be directed to gopets.com instead. The Hises ended the letter by offering to sell gopets.com to GoPets Ltd. for $5 million.

Two days after sending the email and letter, Edward Hise transferred the registration of gopets.com from himself to the brothers' corporation, Digital Overture.

While these exchanges between the Hises and GoPets Ltd. were taking place, the Hises added content to gopets.com. According to records from the Internet Archive, a non-profit organization that archives websites, content first appeared on gopets.com on September 26, 2004, approximately a month after Bethke's first inquiry about the site. Initially, the content consisted solely of a picture and description of a lost dog. The record does not reflect whether the website was updated at all during the next two years. By November 24, 2006, the site was updated with information about guide dogs. On January 6, 2007, the site contained a link to the GoPets.com WIPO arbitration decision. On March 16, 2007, the site contained a "GoPets.com" logo and text saying "Welcome to **goPets**.com the official online website. goAhead [sic] pet lovers tell your friends that **GoPets**.com will be arriving soon!"

Soon after the WIPO decision in their favor, the Hises began registering domain names ("Additional Domains") similar to gopets.com. On November 12, 2006, Edward Hise registered gopet.mobi, gopets.mobi, and gopets.name. On November 15, he registered gopetssite.com and goingpets.com. Between November 20 and the end of December, he registered gopet.biz, gopet.org, egopets.com, gopets.bz, gopets.ws, gopet.tv, gopet.ws, gopet.bz, gopet.de, gopet.eu, and gopet.name. He registered two additional domain names —mygopets.com and igopets.com — several months later.

In March 2007, a few months after the Hises offered to sell gopets.com for $5 million, GoPets Ltd. filed a complaint against the Hises in federal district court for the Central District of California. The complaint alleged cybersquatting under ACPA, service mark infringement and unfair competition under the Lanham Act and California law, service mark dilution under the Lanham Act and California law, and false

advertising under California law. The complaint was amended to add similar claims with respect to the Additional Domains after GoPets Ltd. learned of their existence during discovery. GoPets Ltd. sought injunctive relief, transfer of all the domain names, statutory damages, accounting for wrongful profits, actual damages, and attorney's fees.

On May 27, 2008, the district court granted GoPets Ltd.'s motion for summary judgment on its ACPA and Lanham Act claims. GoPets Ltd. abandoned its state-law claims. The summary judgment order therefore disposed of all the claims in the case. The court granted attorney's fees to GoPets Ltd. The Hises timely appealed.

## II.   Standard of Review

We review *de novo* a district court's order granting summary judgment. *See Bamonte v. City of Mesa*, 598 F.3d 1217, 1220 (9th Cir. 2010). Viewing the evidence in the light most favorable to the Hises, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.*

## III.   Discussion

### A.   Consideration of Late-Filed Documents

As a preliminary matter, we must decide whether the district court properly refused to consider late-filed documents the Hises sought to present and whether any of those documents are properly before us. In the district court, the Hises filed a bare-bones opposition to GoPets Ltd.'s motion for summary judgment. Several weeks later, the Hises filed voluminous "supplemental" materials opposing summary judgment. The Hises seek to include those supplemental materials in the record on appeal.

The district court refused to consider the "supplemental" materials in ruling on the summary judgment motion, holding

that neither the federal nor the local rules required it to give the Hises "yet another bite at the apple," and that in any event the new documents would not change the result. The district court did not abuse its discretion in refusing to consider the Hises' late-filed materials. *See Carpenter v. Universal Star Shipping, S.A.*, 924 F.2d 1539, 1547 (9th Cir. 1991). We note, however, that we may consider many of the "supplemental" documents because they had been filed as exhibits to the Hises' initial opposition to GoPets Ltd.'s motion for a preliminary injunction, and those exhibits were properly before the district court.

## B.   ACPA Claims

### 1.   The Text

**[1]** We begin with the text of the statute. *United States v. Nader*, 542 F.3d 713, 717 (9th Cir. 2008). ACPA provides that

> (A) A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person
>
>> (i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and
>>
>> (ii) registers, traffics in, or uses a domain name that—
>>
>>> (I) in the case of a mark that is distinctive *at the time of registration* of the domain name, is identical or confusingly similar to that mark . . .

15 U.S.C. § 1125(d)(1) (emphasis added). ACPA applies to all domain names, whether registered before or after the enactment of the statute. *See Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 496-97 (2d Cir. 2000) (citing Pub. L. No. 106-113, § 3010, 113 Stat. 1536). To prevail on its ACPA claim, GoPets Ltd. must show (1) registration of a domain name, (2) that was "identical or confusingly similar to" a mark that was distinctive *at the time of registration*, and (3) "bad faith intent" at the time of registration. *See* 15 U.S.C. § 1125(d)(1). At issue in this case is what counts as "registration."

We first discuss the registration and re-registration of gopets.com. We then discuss the registration of the Additional Domains.

### 2.    Gopets.com

GoPets Ltd. concedes that the gopets.com domain name was not "identical or confusingly similar to" a protected mark when Edward Hise registered it in 1999. GoPets Ltd. contends, however, that the term "registration" in ACPA includes re-registrations as well as initial registrations. It contends that the re-registration of the domain name by Digital Overture in December 2006, after Edward Hise transferred it, was a "registration" within the meaning of § 1125(d)(1). Since the service mark GoPets was distinctive in 2006, GoPets Ltd. argues that the 2006 re-registration violated ACPA. The district court agreed with GoPets Ltd.'s argument that a re-registration is a "registration" within the meaning of § 1125(d)(1). For the reasons that follow, we disagree with the district court.

We have previously explained:

> [T]here are three primary actors in the domain name system. First, companies called "registries" operate a database (or "registry") for all domain names within the scope of their authority [e.g., all .com,

.net, .gov, etc. domain names]. Second, companies called "registrars" register domain names with registries on behalf of those who own the names. Registrars maintain an ownership record for each domain name they have registered with a registry. Action by a registrar is needed to transfer ownership of a domain name from one registrant to another. Third, individuals and companies called "registrants" own the domain names. Registrants interact with the registrars, who in turn interact with the registries.

*Office Depot Inc. v. Zuccarini*, 596 F.3d 696, 699 (9th Cir. 2010). When an individual registrant registers a domain name, she pays the registrar a fee and gives the registrar a registrant name, along with contact, billing, and technical information.

**[2]** The words "registration" and "register" are not defined in ACPA. It is obvious that, under any reasonable definition, the initial contract with the registrar constitutes a "registration" under ACPA. It is less obvious which later actions, if any, are also "registrations." After registering, a registrant can take a variety of actions that modify the registration. For instance, the registrant can update the registration if her contact or billing information changes. She can switch to "private" registration, where a third party's name is substituted for hers in the public databases of domain registrants. She can switch between registrars, but leave her contact and billing information unchanged. A registrant can change the name of the registrant without changing who pays for the domain, or a registrant can transfer both the domain and payment responsibilities to someone else. Even if the registrant does none of these things, she must still renew the registration periodically. All of these actions could conceivably be described as "registrations" within the meaning of § 1125(d)(1).

Only one other circuit has addressed the question of re-registrations under ACPA. In *Schmidheiny v. Weber*, 319 F.3d 581 (3d Cir. 2003), Steven Weber registered the domain name

schmidheiny.com in February 1999. Stephan Schmidheiny is one of the wealthiest men in the world. ACPA became law in November 1999. In June 2000, Weber transferred ownership of the domain name to a corporation of which he was the president and treasurer. The corporation then re-registered the domain name with a different registrar. In November 2000, Weber offered to sell the domain name, now owned by the corporation, to Stephan Schmidheiny. *Id.* at 581-82.

**[3]** At issue in *Schmidheiny* was a registration under 15 U.S.C. § 8131(1)(A) (then § 1129(1)(A)). Section 8131(1)(A) prohibits registration of domain names that are the names of, or that are "substantially and confusingly similar" to the names of, living persons. Like § 1125(d)(1), § 8131(1)(A) refers to "registration" without defining the term. The district court had held that re-registering the domain name to the corporation was not a registration within the meaning of § 8131(1)(A). *Id.* at 582. The Third Circuit disagreed, holding "that the word 'registration' includes a new contract at a different registrar and to a different registrant." *Id.* at 583.

**[4]** The Third Circuit assumed that Weber's initial registration of schmidheiny.com was not covered by § 8131(1)(A) because it had been made before the passage of ACPA. *See id.* at 581-82. Based on that assumption, the Third Circuit was concerned that holding that re-registration was not "registration" within the meaning of ACPA would "permit the domain names of living persons to be sold and purchased without the living persons' consent, ad infinitum, so long as the name was first registered before the effective date of the Act." *Id.* However, we believe that the Third Circuit erred in assuming that Weber's initial registration was not covered by ACPA. We agree with the holding of the Second Circuit in *Sporty's Farm* that § 1125(d)(1)—and, by extension, § 8131(1)(A)—apply to registrations made before the passage of ACPA. *See Sporty's Farm*, 202 F.3d at 496-97. If Weber's initial registration violated § 8131(1)(A), as we would hold it did, the Third Circuit's concern evaporates.

**[5]** Like the text of § 8131(1)(A), the text of § 1125(d)(1) considered in isolation does not answer the question whether "registration" includes re-registration. Looking at ACPA in light of traditional property law, however, we conclude that Congress meant "registration" to refer only to the initial registration. It is undisputed that Edward Hise could have retained all of his rights to gopets.com indefinitely if he had maintained the registration of the domain name in his own name. We see no basis in ACPA to conclude that a right that belongs to an initial registrant of a currently registered domain name is lost when that name is transferred to another owner. The general rule is that a property owner may sell all of the rights he holds in property. GoPets Ltd.'s proposed rule would make rights to many domain names effectively inalienable, whether the alienation is by gift, inheritance, sale, or other form of transfer. Nothing in the text or structure of the statute indicates that Congress intended that rights in domain names should be inalienable.

**[6]** We therefore hold that Digital Overture's re-registration of gopets.com was not a registration within the meaning of § 1125(d)(1). Because Edward Hise registered gopets.com in 1999, long before GoPets Ltd. registered its service mark, Digital Overture's re-registration and continued ownership of gopets.com does not violate § 1125(d)(1).

### 3.    Additional Domains

We turn now to the Additional Domains. Unlike gopets.com, these domain names were registered at a time when the GoPets mark was distinctive. The question is whether they were registered in bad faith under § 1125(d)(1).

The district court found that the Hises' registration of the Additional Domains was in bad faith. The district court based its finding in part on the fact that the Hises had used the Additional Domains as leverage to increase the price they could obtain for gopets.com, a domain name whose re-registration,

in the view of the district court, violated ACPA. As just discussed, the re-registration of gopets.com did not violate ACPA. However, we can affirm the district court on any ground supported by the record. *Sec. Life Ins. Co. of Am. v. Meyling*, 146 F.3d 1184, 1190 (9th Cir. 1998). There is ample evidence in the record on which to base a finding of bad faith, even though the re-registration of gopets.com did not violate ACPA.

**[7]** In determining whether a defendant has acted in bad faith within the meaning of § 1125(d)(1)(A), a court may consider, but is not limited to, nine factors. The two relevant factors here are:

> (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark . . . for commercial gain . . . by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site; . . .

> (VIII) the person's registration . . . of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names[.]

15 U.S.C. § 1125(d)(1)(B)(i). We take these two factors in reverse order.

**[8]** First, it is undisputed that the service mark "GoPets" was "distinctive at the time of registration of [the additional] domain names." The Additional Domains are gopet.mobi, gopets.mobi, gopets.name, gopetssite.com, goingpets.com, gopet.biz, gopet.org, egopets.com, gopetz.bz, gopets.ws, gopet.tv, gopet.ws, gopet.bz, gopet.de, gopet.eu, gopet.name, mygopets.com and igopets.com. The Hises argue that these

"multiple domain names" are not "confusingly similar" to "GoPets." The Hises' argument is implausible on its face. The only relevant evidence the Hises sought to introduce in the district court were identical paragraphs in declarations of Edward and Joseph Hise that stated, without elaboration or support, "There are factual issues with respect to the question of whether the . . . domain names listed by plaintiff . . . are confusingly similar to the term gopets. Some of the domain names are definitely not confusingly similar." The district court sustained GoPet Ltd.'s objections to these paragraphs and refused to admit them into evidence. The Hises have not appealed that ruling.

**[9]** Second, it is clear that the Hises intended the Additional Domains "to divert consumers from the mark owner's online location to a site accessible under [these] domain name[s] . . . by creating a likelihood of confusion." The district court found that the Hises registered the Additional Domains for "commercial gain"—that is, that they registered the Additional Domains in order to increase the selling price of gopets.com. The district court believed, incorrectly, that the registration of gopets.com was itself in violation of ACPA. But the legality or illegality of the registration of gopets.com is irrelevant. The question is whether the registration of the Additional Domains was intended to achieve "commercial gain" by confusing consumers and diverting them from the website they intended to access. It clearly was so intended.

**[10]** ACPA contains a safe harbor defense for registrants who "believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii). We have cautioned that the safe harbor defense should be invoked "very sparingly and only in the most unusual cases." *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1203 (9th Cir. 2009) (internal quotation marks omitted). A defendant "who acts even partially in bad faith" cannot successfully assert a safe harbor defense. *Id.* (internal quotation marks omitted).

**[11]** The Hises do not qualify for the safe harbor in their registration of the Additional Domains. The Hises argue that their victory in the WIPO arbitration led them to believe that their registration of the domain name gopets.com was proper. But the WIPO decision gave the Hises no reason to believe they had the right to register *additional* domain names that were identical or confusingly similar to GoPets. The WIPO arbitrator made clear that the Hises prevailed only because the service mark GoPets had not been registered when Edward Hise registered the domain name gopets.com. The Additional Domains were registered well after GoPets was registered as a service mark.

The Hises argue on appeal that GoPets Ltd. acted with unclean hands, and that this should defeat GoPets Ltd.'s claim that the Hises acted in bad faith. The Hises waived that argument by failing to present it to the district court in a timely fashion. *See Walsh v. Nev. Dep't of Human Res.*, 471 F.3d 1033, 1037 (9th Cir. 2006).

**[12]** We therefore affirm the district court's holding that the Hises violated ACPA in registering the Additional Domains.

### 4. Relief

#### a. Damages

**[13]** The district court awarded GoPets Ltd. $100,000 for Digital Overture's re-registration of gopets.com, and $1,000 for each of the registrations of the Additional Domains. Because Digital Overture's re-registration of gopets.com did not violate § 1125(d)(1), the award of $100,000 must be set aside. But we affirm the award of $1,000 for each of the Additional Domains.

The Hises argue that the Seventh Amendment requires that a jury, rather than the court, determine the amount of dam-

ages. We disagree with respect to the damages award for the Additional Domains, the only award now at issue. GoPets Ltd. sought damages under the following provision of ACPA:

> In a case involving a violation of section 1125(d)(1) of this title, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits, an award of statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just.

15 U.S.C. § 1117(d).

The Hises rely on *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340 (1998). In *Feltner*, the Court determined that the copyright statute, 17 U.S.C. § 504(c)(1), did not provide a right to a jury trial on damages. *Id.* at 347. The Seventh Amendment, however, guarantees a right to a jury trial for all "common-law causes of action, [and] actions brought to enforce statutory rights that are analogous to common-law causes of action ordinarily decided in English law courts in the late 18th century . . . ." *Id.* at 348 (internal quotation marks omitted). The Court concluded that copyright damages were a common-law cause of action ordinarily tried by juries in the late eighteenth century. *Id.* at 350. The Court therefore held that the Seventh Amendment provides a right to a jury trial both as to liability and as to the amount of actual copyright damages, even though the copyright statute does not so provide. *Id.* at 355.

**[14]** The language of ACPA's statutory damages provision is essentially identical to the language of the copyright damages provision at issue in *Feltner*.[1] We conclude, as did the

---

[1]That provision reads, "Except as provided by clause (2) of this subsection, the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of

Court in *Feltner*, that the statute does not provide for a jury trial on damages. The question then becomes whether, and to what degree, the Seventh Amendment requires a jury trial.

**[15]** Cybersquatting, of course, was not a common-law action in English courts in the eighteenth century, but cybersquatting is a form of trademark infringement. It is therefore likely analogous to a common-law cause of action. *See Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 472-73 (1962). We need not decide that question, however, because we hold that there is no right to a jury trial when a judge awards the minimum statutory damages. *See BMG Music v. Gonzalez*, 430 F.3d 888, 892-93 (7th Cir. 2005) (explaining that there is no right to a jury trial on damages in copyright cases when only the minimum statutory damages are awarded). Under § 1117(d), the minimum damage award, once liability is established under ACPA, is an "amount of not less than $1,000." If liability has properly been found on summary judgment, the defendant can gain nothing by going to a jury on the question of damages.

**[16]** The district judge awarded the statutory minimum for the registrations of the Additional Domains. Because the Hises are liable under ACPA as a matter of law for these registrations, the Hises have no right to a jury trial on damages.

### b.    Injunctive Relief

The district court ordered that both gopets.com and the Additional Domains be transferred to GoPets Ltd., based on asserted violations of ACPA. Because Digital Overture's re-

---

statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum of not less than $750 or more than $30,000 as the court considers just." 17 U.S.C. § 504(c)(1).

registration of gopets.com did not violate ACPA, the portion of the district court's order applicable to gopets.com cannot be sustained under ACPA. However, the portion of the district court's order applicable to the Additional Domains is proper under ACPA.

## C.   Lanham Act

The district court granted summary judgment to GoPets Ltd. on its claim that the Hises and Digital Overture infringed on its service mark in violation of the Lanham Act.

**[17]** Registration of a domain name without more does not constitute service mark or trademark infringement. *See Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1052 (9th Cir. 1999). With respect to the Additional Domains, there is no evidence that the Hises did anything more than register them. Doing so did not violate the Lanham Act.

**[18]** The same is not true with respect to gopets.com. The Hises did more than merely register the domain name; they also put text on the gopets.com website indicating that it was "GoPets.com the official online website." The district court properly held that in so doing the Hises violated the Lanham Act. *See Lockheed Martin Corp. v. Network Solutions, Inc.*, 985 F. Supp. 949, 957-58 (C.D. Cal. 1997).

**[19]** GoPets Ltd. requested relief in the district court under both ACPA and the Lanham Act. The district court found the Hises liable under both statutes, but appears to have granted relief based solely under ACPA. We have held that Digital Overture's re-registration of gopets.com did not violate ACPA and have set aside the associated relief, but it is possible that some relief with respect to gopets.com may be appropriate based on the Lanham Act violation. We remand to the district court to consider that question in the first instance.

## D.   Attorney's Fees

**[20]** The district court awarded limited attorney's fees to GoPets Ltd. based in part on its holding that Digital Overture's re-registration of gopets.com violated ACPA. Because we have reversed that part of the district court's order, we remand to the district court for reconsideration of attorney's fees.

## Conclusion

We reverse the district court's holding that re-registration of gopets.com by Digital Overtures violated § 1125(d)(1). We affirm its holding that the Hises acted in bad faith, in violation of § 1125(d)(1), by registering the Additional Domains, and we affirm the award of $1,000 for each of those registrations. We affirm the district court's conclusion that the Hises' use of gopets.com violated the Lanham Act, and we remand for determination of any relief the district court might find appropriate for that violation. Finally, we vacate the district court's award of attorney's fees and remand for reconsideration by the district court.

REVERSED   in   part,   AFFIRMED   in   part,   and REMANDED.

Each side shall bear its own costs on appeal.