[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-15309
_____

D.C. Docket No. 1:12-cv-03198-TWT


JYSK BED'N LINEN,
as successor to Quick Ship Holding, Inc.,
d.b.a. By Design Furniture,

                                    Plaintiff -
                                    Counter Defendant -
                                    Appellee,

versus

MONOSIJ DUTTA-ROY,

                                    Defendant -
                                    Counter Claimant -
                                    Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(December 16, 2015)

Before TJOFLAT, WILLIAM PRYOR, and BALDOCK,[*] Circuit Judges.

TJOFLAT, Circuit Judge:

The Anticybersquatting Consumer Protection Act, § 43(d) of the Lanham Act, 15 U.S.C. § 1125(d), provides: "A person shall be liable . . . by the owner of a mark . . . if . . . that person . . . has a bad faith intent to profit from that mark . . .; and . . . registers, traffics in, or uses a domain name that . . . is identical or confusingly similar to that mark." *Id.* § 1125(d)(1)(A). In this case, the District Court granted Jysk Bed'N Linen an injunction requiring Monosij Dutta-Roy to transfer to Jysk four domain names he had registered in his own name. The court also granted Jysk's motion for summary judgment on Dutta-Roy's counterclaims. Dutta-Roy appeals these two decisions pursuant to 28 U.S.C. § 1291 as if, together, they constitute a final judgment in the case.[1] They do not because still pending resolution in the District Court are claims Jysk brought against Dutta-Roy under

_____

[*]Honorable Bobby R. Baldock, United States Circuit Judge for the Tenth Circuit, sitting by designation.

[1] The full text of 28 U.S.C. § 1291 provides:

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

2

§§ 43(a) and (c) of the Lanham Act, 15 U.S.C. §§ 1125(a) and (c), and state law.[2]

Although we lack jurisdiction to entertain Dutta-Roy's appeal under § 1291, we

have jurisdiction under 28 U.S.C. § 1292(a)(1) to review the District Court's

injunction.[3]  Exercising that jurisdiction, we find no merit in Dutta-Roy's

challenges to the injunction and therefore affirm.

## I.

## A.

Jysk Bed'N Linen, Inc.[4] is a retail seller of furniture for the home, office,

and patio operating stores in Georgia, New Jersey, and North Carolina.  Since

1990, it has operated under the trade name and common-law trademark *By*

---

[2] Because there has not been a resolution of all claims by all parties, we do not have jurisdiction under 28 U.S.C. § 1291.  *See, e.g.*, *Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents of the Univ. Sys. of Ga.*, 633 F.3d 1297, 1306 (11th Cir. 2011) ("The district court's . . . order . . . was not a final appealable order under 28 U.S.C. § 1291 because it did not resolve all pending claims against all parties.").

[3] The full text of 28 U.S.C. § 1292(a)(1) provides:

> (a) Except as provided in subsections (c) and (d) of this section, the courts of appeals shall have jurisdiction of appeals from:

>> (1) Interlocutory orders of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court.

The injunctive order the District Court issued is interlocutory because four of Jysk's claims are still pending resolution.

[4] Dutta-Roy initially dealt with Jysk through its predecessor—Quick Ship Holding, Inc., d/b/a By Design Furniture, a company Jysk absorbed.  For clarity, we refer to these entities together throughout the opinion simply as Jysk.

*Design*.[5]  In early 1999, Jysk contracted with Monosij Dutta-Roy, Shashi Sonnad, Ashish Negandhi, and Dev Worah to create an online-shopping website.  The website needed a domain name, so Dutta-Roy was instructed to register the name *bydesignfurniture.com*, listing Jysk as the owner.[6]  Dutta-Roy registered that domain name, in April 1999, but he listed himself, not Jysk, as the owner.

In September 1999, Dutta-Roy, Sonnad, Negandhi, and Worah formed Bazaarworks, LLC, and began working on the website.  At first, Dutta-Roy worked on designing the website.  After the relationship between Jysk and Bazaarworks fell apart in 2003, Sonnad took over through her company, Dead Dog, Inc., and monitored the website's performance through the filing of this lawsuit.[7]

On April 9, 2012, Dutta-Roy's registration of *bydesignfurniture.com* expired, which caused Jysk's website to go down.  Jysk immediately discovered that it did not own the registration because it was in Dutta-Roy's name, and asked Dutta-Roy to re-register *bydesignfurniture.com* in its name.  Dutta-Roy refused.  On April 20, he re-registered *bydesignfurniture.com* and on April 26 he registered the domain names *bydesignfurniture.org*, *bydesignfurnitures.com*, and *bydesign-furnitures.com.*

---

[5] The parties dispute whether Jysk's trademark is *By Design* or *By Design Furniture*.  Because, as explained in part II.A.2, *infra*, the domain names at issue are identical or confusingly similar to both, it is immaterial which trademark Jysk actually owns.

[6] As we indicate in part I.B, *infra*, this point is disputed by the parties.

[7] Sonnad's work included major redesigning of the website in 2006 and 2008.

4

Dutta-Roy thereafter offered to transfer the domain names to Jysk "if [he was] adequately compensated solely for the over 4,000 hours work [he] . . . performed for [Jysk] pursuant to the Partnership Agreement" between Bazaarworks, LLC and Jysk's predecessor, Quick Ship Holding, Inc.  The agreement never existed; therefore, Jysk rejected Dutta-Roy's offer.  It filed this lawsuit instead.

### B.

Jysk brought this action against Dutta-Roy in the Northern District of Georgia on September 12, 2012.  Its complaint contained five counts.  Our discussion today deals with only one of the counts, Jysk's claim under the Anticybersquatting Consumer Protection Act ("ACPA").[8]  The ACPA count recited the facts set out in part I.A above, with the exception of Dutta-Roy's registration on April 26, 2012, of the domain names *bydesignfurniture.org*, *bydesignfurnitures.com*, and *bydesign-furnitures.com*, and alleged that Dutta-Roy intended in bad faith "to profit from the registration and use of the Internet domain name bydesignfurniture.com by creating an association with [Jysk]'s famous bydesignfurniture.com trademark as to source or sponsorship and further by intending to dilute the distinctive quality of, [Jysk]'s famous

---

[8] The counts we do not address in this opinion because they are still pending in the District Court are claims for unfair competition under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); trademark dilution under § 43(c) of the Lanham Act, 15 U.S.C. § 1125(c); and unfair competition and conversion under Georgia law.

bydesignfurniture.com trademark."  The ACPA count sought preliminary and permanent injunctive relief, including an order requiring Dutta-Roy "to relinquish all rights in the Internet domain name bydesignfurniture.com."

Dutta-Roy's answer denied that he was instructed to register the domain name *bydesignfurniture.com* and designate Jysk as the owner, and that he intended to profit by maintaining the registration in his name.[9]  After answering Jysk's complaint, Dutta-Roy moved the District Court for leave to join Bazaarworks, LLC as a party.  The court denied the motion.[10]  At this point, Dutta-Roy's attorneys moved the court for leave to withdraw.[11]  The court granted the motion, and Dutta-Roy decided to proceed *pro se*.[12]  Shortly thereafter, Jysk moved the District Court for a preliminary injunction.  Jysk requested the court to enjoin Dutta-Roy from:

---

[9] Dutta-Roy accompanied his answer with a counterclaim containing six counts for monetary relief based on Jysk's breach of a partnership agreement Bazaarworks, LLC had allegedly made with Jysk's predecessor, Quick Ship Holding, Inc.  According to Dutta-Roy, Quick Ship Holding agreed to compensate Dutta-Roy and Bazaarworks, LLC  based  upon levels  of revenue  generated through  the  online-shopping website.

> Specifically,  it  was  agreed that Dutta-Roy and Bazaarworks, LLC would receive twelve  percent  (12%)  of sales if the sales  were  less than One Million Dollars ($1,000,000.00),  eleven percent (11%) if the sales were between  One and Two Million Dollars ($1,000,000.00  and  $2,000,000.00) and  ten  percent (10%) of sales  if  sales exceeded Two Million Dollars ($2,000,000.00) attributable to the website.

Doc. 5 at 17.

[10] The court denied Dutta-Roy's motion because Bazaarworks, LLC had been dissolved in 2005.

[11] Counsel moved the court for leave to withdraw due to their inability to agree with Dutta-Roy on an appropriate litigation strategy.

[12] Dutta-Roy is prosecuting this appeal *pro se*.

6

I.    Doing anything with or to the registration of the bydesignfurniture.com domain that would cause the Plaintiff's website to be unable to be accessed by the public, or result in the removal of the domain from the internet;

II.   Transferring ownership of the bydesignfurniture.com domain to anyone, other than the Plaintiff;

III.  Altering in any way the current contents of the bydesignfurniture.com domain and website; and

IV.   Doing anything that would cause a change in the current status quo of the bydesignfurniture.com trademark.

The court granted the preliminary injunction as to requests I, II, and IV and denied it with respect to request III.[13]

At the close of discovery, Jysk moved the District Court for partial summary judgment. In effect, the motion sought an expansion of the preliminary injunction previously issued with respect to Jysk's ACPA claim so that the injunction would cover the domain names *bydesignfurniture.org*, *bydesignfurnitures.com*, and *bydesign-furnitures.com* in addition to *bydesignfurniture.com*.[14] The court granted the motion. It found that Dutta-Roy, in re-registering *bydesignfurniture.com* on April 20, 2012, and in registering *bydesignfurniture.org*, *bydesignfurnitures.com*,

---

[13] A transcript of the hearing the District Court held on Jysk's motion for a preliminary injunction is not part of the record on appeal.

[14] Jysk also moved the District Court for summary judgment on Dutta-Roy's counterclaims. As indicated in the opening paragraph of this opinion, the court granted the motion.

and *bydesign-furnitures.com* on April 26, 2012, did so in bad faith, violating Jysk's rights under the ACPA, and ordered him to transfer the names to Jysk.[15]

II.

We review Dutta-Roy's appeal of the District Court's preliminary injunction for an abuse of discretion. *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 968 (11th Cir. 2005). "'A district court abuses its discretion if it applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that are clearly erroneous.' A district court may also abuse its discretion by applying the law in an unreasonable or incorrect manner." *Klay v. United Healthgroup, Inc.,* 376 F.3d 1092, 1096 (11th Cir. 2004) (citation omitted) (quoting *Martin v. Automobili Lamborghini Exclusive, Inc.*, 307 F.3d 1332, 1336 (11th Cir. 2002)).

Jysk was entitled to a preliminary injunction if it showed: "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction is issued; (3) the threatened injury to the moving party outweighs whatever damage the proposed injunction might cause the non-moving party; and (4) if issued, the injunction would not be adverse to the public interest." *BellSouth Telecomms., Inc.*, 425 F.3d at 968 (citing *Four Seasons Hotels &*

---

[15] The court also awarded Jysk statutory damages of $4,000.

*Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1210 (11th Cir. 2003)).[16]

We review each of the factors in turn.

## A.

Jysk's "substantial likelihood of success on the merits" turns on a preliminary question: whether Dutta-Roy's re-registration of *bydesignfurniture.com* falls within the ACPA's "registration" hook. We hold that the re-registration constituted a registration under the ACPA and that Jysk is likely to succeed on the merits of its ACPA claim.

## 1.

Dutta-Roy argues that the District Court erred in determining that his conduct fell within the ACPA. Read generously, his argument is this: his re-registration of *bydesignfurniture.com*, on which the District Court based its finding

---

[16] "'The standard for [obtaining] a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success.'" *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 32, 129 S. Ct. 365, 381, 172 L. Ed. 2d 249 (2008) (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12, 107 S. Ct. 1396, 1404, 94 L. Ed. 2d 542 (1987)).

> After prevailing on the merits,
> "[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."

*Monsanto Co. v. Geertson Seed Farms,* 561 U.S. 139, 156–57, 130 S. Ct. 2743, 2756, 177 L. Ed. 2d 461 (2010) (alteration in original) (quoting *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391, 126 S. Ct. 1837, 1839 164 L. Ed. 2d 641 (2006)).

of bad faith, could not have violated the ACPA because re-registrations are not "registrations" within the purview of the statute.  We disagree.

Internet websites are located at Internet Protocol ("IP") addresses, which consist of a string of numbers.  Karl M. Manheim & Lawrence B. Solum, *An Economic Analysis of Domain Name Policy*, 25 Hastings Comm. & Ent. L. J. 359, 364–65 (2003).  "An Internet domain name is an alpha-numeric mnemonic device that can be mapped onto an [IP] address to enable users" to more easily access websites.  Jacqueline D. Lipton, *Beyond Cybersquatting: Taking Domain Name Disputes Past Trademark Policy*, 40 Wake Forest L. Rev. 1361, 1365 (2005).  Domain names are unique.  Manheim & Solum, *supra*, at 364.  It is therefore important that the trademark owner reserve the domain name closely associated with or identical to its trademark so that it may take advantage of its goodwill.  The registration of domain names is managed by the private organization Internet Corporation for Assigned Names and Numbers ("ICANN").  Lipton, *supra*, at 1366–67.  ICANN oversees numerous third-party registries with which the applicant registers the domain name.  *Id.* at 1367.  The third-party registry is referred to as the *registrar*, and the applicant, who later becomes the owner of the domain name, is referred to as the *registrant*.

The ACPA was enacted to prevent cybersquatting.  *S. Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d 1235, 1246 (11th Cir. 2009).  Cybersquatting is

10

essentially extortion.  Cybersquatting can take the form of "register[ing] numerous domain names containing . . . trademarks or tradenames only to hold them ransom in exchange for money."  *Id.* at 1247 (quotation marks omitted) (quoting H.R. Rep. No. 106-412 (1999)).  Another form of cybersquatting occurs when the cybersquatter "intend[s] to profit by diverting customers from the website of the trademark owner to the defendant's own website, where those consumers would purchase the defendant's products or services instead of the trademark owner's." *Id.* (quotation marks omitted) (quoting *Utah Lighthouse Ministry v. Found. for Apologetic Info. and Research*, 527 F.3d 1045, 1058 (10th Cir. 2008)).  In a sense, the cybersquatter muddies the clear pool of the trademark owner's goodwill and then profits off the resulting murkiness.

The ACPA provides that,

A person shall be liable in a civil action by the owner of a mark . . . if . . . that person—
(i) has a *bad faith intent* to profit from that mark . . .; and
(ii) *registers, traffics in, or uses* a domain name that . . . in the case of a mark that is *distinctive* at the time of registration of the domain name, is identical or confusingly similar to that mark.[17]

---

[17] The full text of the relevant provision is as follows:

(1)(A) A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section if, without regard to the goods or services of the parties, that person—

(i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and

(ii) registers, traffics in, or uses a domain name that—

15 U.S.C. § 1125(d)(1)(A) (emphasis added). There are three statutory conduct hooks that can land a defendant within the purview of the ACPA: "register[ing]," "traffic[king] in," and "us[ing]" a domain name. *Id.* That defendant will violate the ACPA if it commits in bad faith one of these three actions with respect to a domain name that is identical or confusingly similar to a distinctive mark. *Id.* The statute provides a list of nine factors that may be considered by the court when determining whether the defendant "ha[d] a bad faith intent to profit from th[e] mark." *Id.* Those factors are:

1. Whether the defendant has a "trademark or other intellectual property rights" in the domain name;

2. Whether the domain name refers to the legal name of the defendant;

3. Whether the defendant ever used the domain name "in connection with the bona fide offering of any goods or services;"

4. Whether the defendant has a "bona fide noncommercial or fair use of the mark in a site accessible under the domain name;"

---

(I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark; or

(II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or

(III) is a trademark, word, or name protected by reason of section 706 of Title 18 or section 220506 of Title 36.

15 U.S.C. § 1125(d)(1)(A).

5. Whether the defendant has an "intent to divert consumers" from the mark owner's website to his own, either for commercial gain "or with the intent to tarnish or disparage the mark," when that diversion could cause harm to the mark owner's goodwill;

6. Whether the defendant offers to transfer or sell the domain name for financial gain when he has not used or had an intent to use the domain name in connection with "the bona fide offering of any goods or services;"

7. Whether the defendant provides "material and misleading false contact information when applying for the registration of the domain name" or the defendant "intentional[ly] fail[s] to maintain accurate contact information";

8. Whether the defendant acquired multiple domain names that the defendant knows are identical or confusingly similar to distinctive marks; and

9. Whether the mark is distinctive or famous.[18]

---

[18] The full text of the statutory factors is as follows:

(B)(i) In determining whether a person has a bad faith intent described under subparagraph (A), a court may consider factors such as, but not limited to—

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name;
>
> (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
>
> (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
>
> (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
>
> (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
>
> (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

*Id.* § 1125(d)(1)(B)(i).  There is also a safe-harbor provision in the ACPA that provides that "[b]ad faith intent . . . shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." *Id.* § 1125(d)(1)(B)(ii).[19]

We review a district court's interpretation of a statute *de novo*.  *Silva-Hernandez v. U.S. Bureau of Citizenship & Immigration Servs.*, 701 F.3d 356, 361 (11th Cir. 2012) (quoting *Serrano v. U.S. Att'y Gen.*, 655 F.3d 1260, 1264 (11th Cir. 2011)).  The District Court assumed without discussion that a re-registration

---

> (VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;
>
> (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and
>
> (IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

15. U.S.C. § 1125(d)(1)(B).

[19] The full text of the safe-harbor provision is: "Bad faith intent described under subparagraph (A) shall not be found in any case in which the court determines that the person believed and has reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(B)(ii).

14

falls within the ACPA's purview under the Act's registration hook.  This is an issue of first impression for our circuit.

Two of our sister circuits have provided divergent answers to this question. The Third Circuit, in *Schmidheiny v. Weber*, 319 F.3d 581 (3d Cir. 2003), found that a re-registration falls within the registration hook of the ACPA.  *Id.* at 581.  It explained that "the language of the statute does not limit the word 'registration' to the narrow concept of 'creation registration'" and that "[t]he words 'initial' and 'creation' appear nowhere in [the statute]."  *Id.* at 582–83.  The Third Circuit likened the registration of the domain name to a contract between the registrar and the registrant, and specifically held "that the word 'registration' includes a new contract at a different registrar and to a different registrant."  *Id.* at 583.

The Ninth Circuit came to the opposite conclusion in *GoPets Ltd.v. Hise*, 657 F.3d 1024 (9th Cir. 2011), holding that a re-registration is not a registration for purposes of the ACPA.  *Id.* at 1032.  The Ninth Circuit viewed the domain-name registration through the lens of property law, rather than through the Third Circuit's analogy to contract law.  *Id.* at 1031.  It reasoned that a registrant owns a property right in the domain name when he registers it, and therefore he is entitled to transfer that property to another owner.  *Id.*  "The general rule is that a property owner may sell all of the rights he holds in property."  *Id.*  The Ninth Circuit worried that if it were to hold that a re-registration fell within the purview of the

15

Act, it "would make rights to many domain names effectively inalienable, whether the alienation is by gift, inheritance, sale or other form of transfer." *Id.* at 1031–32.

We agree with the Third Circuit. The Act does not define the term *register*. The Act nowhere contains the qualifications of *initial* or *creation* when it refers to the act of registering. It refers simply to a registration, and a re-registration is, by definition, a registration. To "re-register" is "[t]o register again." *Re-register, v.*, Oxford English Dictionary (2015). "When the language of a statute is plain and unambiguous we must apply that meaning." *Cox Enters., Inc. v. Pension Benefit Guar. Corp.*, 666 F.3d 697, 704 (11th Cir. 2012); *see also Redus Fla. Commercial, LLC v. Coll. Station Retail Ctr., LLC*, 777 F.3d 1187, 1191 (11th Cir. 2014) ("Generally, words are interpreted with their ordinary and plain meaning because we assume that [the legislature] uses words in a statute as they are commonly understood." (citation, quotation marks, and alterations omitted)).

Including re-registrations under the registration hook comports with the purpose of Congress in enacting the ACPA—to prevent cybersquatting. *See S. Grouts & Mortars, Inc.*, 575 F.3d at 1246–47 ("Registering a famous trademark as a domain name and then offering it for sale to the trademark owner is exactly the wrong Congress intended to remedy when it passed the ACPA." (quotation marks omitted) (quoting *Ford Motor Co. v. Catalanotte*, 342 F.3d 543, 549 (6th Cir.

16

2003))). It would be nonsensical to exempt the bad-faith re-registration of a domain name simply because the bad-faith behavior occurred during a noninitial registration, thereby allowing the exact behavior that Congress sought to prevent.

We accordingly will not read additional words into the statute such as *initial* or *creation*. The plain meaning of *register* includes a re-registration. The District Court correctly held that a re-registration falls within the purview of the ACPA.

2.

Next, we must determine whether the District Court correctly determined that Jysk was likely to succeed on the merits of its ACPA claim. To show a violation of the ACPA, Jysk had to show that Dutta-Roy registered the domain name, that the domain name was identical or confusingly similar to its trademark that was distinctive at the time of the registration, and that the domain name was registered in bad faith. 15 U.S.C. § 1125(d). There is no dispute that *bydesignfurniture.com*, *bydesignfurniture.org*, *bydesignfurnitures.com*, and *bydesign-furnitures.com* were registered by Dutta-Roy, and there is no serious dispute that *bydesignfurniture.com*, *bydesignfurniture.org*, *bydesignfurnitures.com*, and *bydesign-furnitures.com* are identical or at least confusingly similar to Jysk's

17

marks *bydesignfurniture.com* and *By Design*.  Jysk has also established that it owns

the marks *bydesignfurniture.com* and *By Design*.[20]

A distinctive mark "serve[s] the purpose of identifying the source of the

goods or services."  *Welding Servs. Inc. v. Forman*, 509 F.3d 1351, 1357 (11th Cir.

2007).  "Trademark law distinguishes four gradations of distinctiveness of marks,

in descending order of strength: fanciful or arbitrary, suggestive, descriptive, and

generic."[21]  *Id.*  A descriptive mark

> can acquire distinctiveness or "secondary meaning" by becoming associated
> with the proprietor's product or service. . . . A name has acquired secondary
> meaning when "the primary significance of the term in the minds of the
> [consuming] public is not the product but the producer." . . . A proprietor
> can make a prima facie showing of "secondary meaning" by showing that
> the name has been used in connection with the proprietor's goods or service
> continuously and substantially exclusively for five years.

---

[20] Dutta-Roy suggests that he, rather than Jysk, owns the *bydesignfurniture.com* mark. It is true that Dutta-Roy has control of the domain name *bydesignfurniture.com*.  But it is not clear that Dutta-Roy understands that it is possible for *bydesignfurniture.com* to serve as both a domain name and a trademark and for control of these two to vest in different entities, as it does here.  "Common-law trademark rights are 'appropriated only through actual prior use in commerce.'"  *Crystal Entm't & Filmworks, Inc. v. Jurado*, 643 F.3d 1313, 1321 (11th Cir. 2011) (quoting *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1193–94 (11th Cir. 2001)). The District Court correctly concluded that Jysk owns the common-law trademarks *By Design* and *bydesignfurniture.com* because Jysk has been using the marks in commerce in connection with its goods since at least 1990 and 1999, respectively.

[21] A generic mark is not distinctive and "may not be registered as a trademark."  *Welding Servs. Inc. v. Forman*, 509 F.3d 1351, 1358 (11th Cir. 2007).  Within the remaining three gradations, marks can either be inherently distinctive or they can acquire distinctiveness "by becoming associated with the proprietor's product or service."  *Id.*  Marks that are merely descriptive require acquired distinctiveness, while suggestive and fanciful or arbitrary marks are inherently distinctive.  *Id.* A merely descriptive mark "identifies a characteristic or quality of the service or product."  *Id.*

18

*Id.* (alteration in original) (quoting *Am. Television & Commc'ns Corp. v. Am. Commc'ns & Television, Inc.*, 810 F.2d 1546, 1548–49 (11th Cir. 1987)).  We need not determine which gradation of distinctiveness Jysk's marks fall under; all we need decide is whether they are distinctive.

Jysk's marks were distinctive when Dutta-Roy registered the domain names in 2012.  Even if *bydesignfurniture.com* and *By Design* are merely descriptive of Jysk's furniture, Jysk has been using these marks for far more than five years, and the marks therefore have acquired secondary meaning.  *See id.*  Additionally, in a November 2012 letter, the United States Patent and Trademark Office responded to Jysk's application for acquired distinctiveness status for the *bydesignfurniture.com* mark, stating that the application was "unnecessary because the mark appears to be inherently distinctive and is eligible for registration on the Principal Register without proof of acquired distinctiveness."  Jysk's marks *bydesignfurniture.com* and *By Design* are therefore distinctive.

Dutta-Roy argues that he did not act in bad faith when registering the domain names.  The District Court found that at least five of the nine permissive statutory factors of bad faith were relevant to Dutta-Roy's actions:

> Here, the 2012 registrations of bydesignfurniture.com, bydesignfurniture.org, bydesignfurnitures.com, and bydesign-furnitures.com were made in bad faith. The Defendant does not have intellectual property rights in the bydesignfurniture.com trade name. The Defendant has never used the websites for a bona fide offering of goods or services. The Defendant re-registered bydesignfurniture.com

19

and registered the three similar domain names after the Plaintiff approached him to recover the bydesignfurniture.com domain name. Further, the Defendant demanded payment from the Plaintiff for the domain names, and the Defendant admits he intends to profit from the registration and use of the domain name.

We agree with the District Court's analysis.  When Dutta-Roy re-registered *bydesignfurniture.com* under his own name rather than Jysk's, he was expressing his intent or ability to infringe on Jysk's trademark.  He admitted that he never had used the domain names in the bona fide offering of any goods or services.  His demand for money can be looked at in two ways, and they are two sides of the same coin.  First, the amount of money demanded could show how much he believes the domain name smudges the goodwill of the trademark—that is, how much money Jysk would lose out on if Dutta-Roy were to use the domain names to misdirect Jysk's customers.  Second, the amount of money demanded could show how much value he believes Jysk puts on the domain names.  In either case, bad-faith intent abounds.

As for the factors, we find one, three, six, and eight relevant.[22]  Dutta-Roy does not have any intellectual-property rights in the domain names, nor does he

---

[22] Those factors are, again:

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name; . . .

> (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services; . . .

20

offer or has ever offered any goods or services in connection with the domain names.  Dutta-Roy did offer to transfer or sell the domain name to the mark owner, Jysk, for financial gain without having used it in connection with the offering of any goods or services.  Dutta-Roy did register multiple domain names that he knew are identical or confusingly similar to Jysk's marks.

Finally, Dutta-Roy is unable to take advantage of the ACPA safe harbor, which provides that bad faith will not be found when "the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful."  15 U.S.C. § 1125(d)(B)(ii).  Dutta-Roy's apparent belief that he was entitled to take the domain name hostage in exchange for the alleged contract price in the partnership agreement purportedly entered into by Jysk's predecessor

---

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct; . . .

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties.

15 U.S.C. § 1125(d)(1)(B).

21

and Bazaarworks, LLC[23] is without basis in the agreement or in law, and therefore unreasonable.

Because Jysk showed that Dutta-Roy registered the domain names, that the domain names were identical or confusingly similar to Jysk's distinctive mark at the time of the registration, that Dutta-Roy had bad-faith intent at the time of the registrations, and that Dutta-Roy cannot avail himself of the safe harbor's protections, Jysk has shown that it is substantially likely to prevail on the merits of its ACPA claims.

B.

Next, we must determine whether the District Court erred in determining that Jysk would suffer irreparable injury unless the injunction issued, that the balance of harms weighed in Jysk's favor, and that the public interest would not be disserved by the injunction. *BellSouth Telecomms., Inc.*, 425 F.3d at 968. If the websites were not transferred to Jysk, Jysk would not have had full control over websites that bear its trademark and could have lost goodwill. "Although economic losses alone do not justify a preliminary injunction, 'the loss of customers and goodwill is an irreparable injury.'" *Id.* at 970 (quoting *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991)). Dutta-Roy was not using the domain name in any way other than to host Jysk's website. He was

---

[23] *See supra* note 9.

22

not offering any goods or services for sale nor even charging Jysk a licensing price for the use of the domain name.  Therefore, there is no potential harm to Dutta-Roy, and the balance of harms weighs in Jysk's favor.  Finally, the injunction will not disserve the public interest because it places the domain names in the hands of their rightful owner:  the trademark holder.  Dutta-Roy's actions are those of a cybersquatter, and therefore granting an injunction to Jysk fulfills Congress's policy goals in enacting the ACPA.

### III.

For the foregoing reasons, we conclude that the District Court's issuance of the preliminary injunction did not constitute an abuse of discretion and is accordingly AFFIRMED.[24]

AFFIRMED.

---

[24] Dutta-Roy's appeal of the District Court's order granting Jysk summary judgment on his counterclaims is dismissed for lack of jurisdiction.  *See* 28 U.S.C. § 1291.